# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 05-1468

Frances D'Aries, Appellant,

v.

James B. Peake, M.D.,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veterans' Appeals

(Argued February 6, 2008                        Decided April 8, 2008    )

*Michael A. Leonard*, of Wilmington, North Carolina, for the appellant.

*Leslie C. Rogall*, with whom *Paul J. Hutter*, Acting General Counsel; *R. Randall Campbell*, Assistant General Counsel; and *Joan E. Moriarty*, Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before KASOLD, HAGEL, and LANCE, *Judges*.

PER CURIAM.  HAGEL, *Judge*, and LANCE, *Judge*, filed concurring opinions.

PER CURIAM: Before the Court is Frances D'Aries's appeal of a May 18, 2005, Board of Veterans' Appeals (Board) decision that denied service connection for the cause of her husband's death under 38 U.S.C. § 1310.  Because the VA medical examination sought under the authority of 38 U.S.C. § 7109 and 38 C.F.R. § 20.901 was adequate for rating purposes, the Board provided adequate reasons or bases for rejecting the opinion of the treating physician, and there was no error in the notice provided, the Board decision will be affirmed.

## I.  FACTS

Mrs. D'Aries's husband, Lawrence D'Aries, served on active duty in the U.S. Army from December 1942 to February 1946 during World War II.  His service included combat duty in Germany, where he suffered a head injury in March 1945 when a shell landed near him.  At the time

of his death on December 27, 1998, Mr. D'Aries was receiving VA compensation for several service-connected disabilities, including chronic brain syndrome associated with brain trauma from the 1945 incident, with post-traumatic headaches, rated 70% disabling, and a loss of bone of the skull, rated 30% disabling. His combined schedular evaluation was 80% disabling. The death certificate listed his cause of death as cardiorespiratory arrest due to or as a consequence of sepsis, due to or as a consequence of pneumonia. Record (R.) at 177.

In April 1999, Mrs. D'Aries applied for dependency and indemnity compensation. With her claim, Mrs. D'Aries submitted a letter from Mr. D'Aries's private physician, Dr. Henry McCabe. In that letter, Dr. McCabe expressed his opinion that Mr. D'Aries's chronic brain disorder, "along with his [d]iabetes, prevented him from sensing appropriately the symptoms which were developing leading up to his pneumonia and blood poisoning (sepsis), and ultimately, unfortunately, his untimely demise." R. at 179. In August 1999, VA received Mr. D'Aries's hospital admission records, which indicated that he had been admitted to the hospital on December 27, 1998, with a cough, fever, and confusion. The record noted that he had a history of "congestive heart failure, diabetes mellitus, cerebrovascular accident with right hemiplegia, and chronic obstructive pulmonary disease." R. at 194. Later that same day, Mr. D'Aries was found in respiratory distress and intubated, and died shortly thereafter.

In August 1999, after reviewing the medical evidence of record, a VA regional office denied Mrs. D'Aries's claims for benefits for the cause of her husband's death and dependency and indemnity compensation, finding that there was no relationship between Mr. D'Aries's death and his military service. Mrs. D'Aries filed a Notice of Disagreement with that decision.

In January 2000, Dr. McCabe submitted another letter regarding Mr. D'Aries's death. In that letter, Dr. McCabe indicated that he had treated Mr. D'Aries "primarily" for diabetes mellitus, congestive heart failure, arteriosclerotic cardiovascular disease, atrial fibrillation, and hypertension. R. at 233. Dr. McCabe wrote:

> The combination of [Mr. D'Aries's] diseases, arteriosclerotic cardiovascular disease and hypertension all combined to cause a chronic organic brain syndrome, which became progressively worse in his later years. . . . [I]t is my opinion that these problems both directly and indirectly contributed to the condition listed at the time of his demise (i.e.[,] Chronic Brain Syndrome).

2

It is quite possible that the head trauma which he sustained many years ago may also have contributed to this condition, but in all likelihood, the more chronic and progressive nature of his other conditions was responsible for the deterioration of his mental skills later in life.

*Id.* Mrs. D'Aries appealed to the Board in April 2000.

In May 2001, Mrs. D'Aries received notice pursuant to the then-recently enacted Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, 114 Stat. 2096 (codified at 38 U.S.C. § 5103). That letter explained what information and evidence she was responsible for obtaining and what information and evidence VA would obtain. The letter also explained the evidence necessary to establish entitlement to compensation for service-connected conditions and advised Mrs. D'Aries of the information VA needed from her. A Supplemental Statement of the Case was issued in April 2002. That document advised Mrs. D'Aries that her claim had been "considered based on all the evidence of record, including review of [the] claim as a result of [the] passage of [the] Veterans Claims Assistance Act of 2000." R. at 254. Also in that document, the regional office continued to deny entitlement to dependency and indemnity compensation and service connection for the cause of Mr. D'Aries's death.

In August 2002, the Board remanded Mrs. D'Aries's claims in order to afford her a hearing before the Board. In October 2002, Dr. McCabe submitted a third letter regarding Mr. D'Aries's death. In that letter, Dr. McCabe wrote:

Towards the latter part of his life, Mr. D'Aries began to experience symptoms consistent with Organic Brain Syndrome. These symptoms included confusion, hallucinations, euphoria, agitation, insomnia[,] and[,] subsequently[,] disequilibrium.

In all probability, the culmination of this entity was initiated by an episode of severe head trauma which he sustained many years ago. Over a long period of time[,] this caused cerebral atrophy[,] which significantly reduced and impaired his mental capacity and motor skills.

Despite his other medical illnesses[,] it was the complications of his Organic Brain Syndrome and their sequelae which led to his mental and physical deterioration later in life[,] and ultimately to his demise. It is my medical opinion that any retroactive review of his government benefits must incorporate this issue in its evaluation due to the causal effect it had upon his death.

R. at 262. Mrs. D'Aries was afforded a Board hearing held in February 2003.

3

In October 2004, the Board informed Mrs. D'Aries that it had "decided to ask one or more experts to provide a medical opinion" with respect to her claim for benefits for the cause of her husband's death.[1]  R. at 279.  The Board sent an engagement letter to the Portland, Oregon, VA Medical Center, asking the chief of staff of that facility for a "medical expert opinion."  R. at 281. Specifically, the Board requested that "an internal medicine specialist . . . provide a medical advisory opinion" on the question of whether Mr. D'Aries's chronic brain syndrome and/or loss of bone of the skull caused or contributed to his death.  *Id.*  The Board directed that the medical expert "review the claims file in its entirety" and included an explanation of the criteria for determining whether a condition was a principal or contributory cause of death.  R. at 281-82.  Finally, the Board requested that the medical expert comment on the opinions offered by Dr. McCabe.  R. at 282.

That same month, Dr. Joseph Quinn, a neurologist with the Portland VA medical center, provided the requested opinion.  Dr. Quinn recounted Mr. D'Aries's extensive medical history, beginning with the head trauma he suffered in 1945 and ending with the illnesses that preceded his death in 1998.  Dr. Quinn noted that there was no evidence in Mr. D'Aries's medical history that he suffered from mental impairment, retardation, or difficulty concentrating as a result of his head trauma.  Dr. Quinn also summarized the opinions of Dr. McCabe, highlighting those portions quoted above.  In pertinent part, Dr. Quinn concluded:

> [T]he record indicates that [Mr. D'Aries] sustained a severe head injury in 1945, resulting in chronic headaches and "nervousness", but without cognitive or other neurologic deficits.  He was first appreciated to show signs of dementia in 1987, in concert with evidence of severe diabetes-related vascular disease.  His cognitive deficits were still considered mild during evaluation only a few months before his death in 1998.  His death by pneumonia and sepsis is not unusual for unhealthy elderly diabetic patients, even in the absence of dementia.
>
> I conclude that there is little evidence to indicate that [Mr. D'Aries's] head injury caused his dementia, and that there is little evidence to indicate that the dementia was severe enough to result in pneumonia and sepsis.  I therefore further conclude that [his] service-connected brain syndrome did not cause or contribute to his death.

---

[1] The Court notes that the Board bifurcated Mrs. D'Aries's claims in September 2003 and denied her claim for dependency and indemnity compensation under 38 U.S.C. § 1318.  This Court reversed that decision and remanded the matter to the Board for readjudication.  *See D'Aries v. Nicholson*, No. 03-1974, 2006 WL 954009 (Vet. App. Feb. 22, 2006).  The Secretary has appealed that decision, and the appeal is currently pending before the U.S. Court of Appeals for the Federal Circuit.

4

R. at 274-75.

On May 18, 2005, the Board issued the decision on appeal, denying entitlement to service connection for the cause of Mr. D'Aries's death. The Board first determined that VA had satisfied its duty to notify under the Veterans Claims Assistance Act through the May 2001 letter. The Board noted that the letter was provided after the initial adjudication of the claim in August 1999, but found that any defect was non-prejudicial because there was no indication that the outcome of the case had been affected, and because Mrs. D'Aries had been afforded a meaningful opportunity to participate in the processing of her claim.

With respect to the merits of the claim, the Board attached "significant probative value" to the opinion of Dr. Quinn and "essentially no probative value" to the opinion of Dr. McCabe. R. at 6. The Board found that Dr. Quinn had reviewed Mr. D'Aries's claims file and provided "a thorough and detailed opinion about a disorder within his area of medical expertise" that was "consistent with the competent evidence o[f] record." *Id.* In contrast, the Board stated that it could not establish whether Dr. McCabe had reviewed the claims file before rendering his October 2002 opinion, which the Board found included "virtually no rationale and . . . fail[ed] to address how [Mr. D'Aries's] mental deterioration resulted in sepsis and pneumonia." R. at 6-7. The Board also noted factual and medical inconsistencies in Dr. McCabe's opinions, which it found "greatly reduce[d] the probative value of his most recent (and most favorable) opinion." R. at 7. The Board stated that the fact that Dr. McCabe was Mr. D'Aries's treating physician did not, alone, increase the probative value of his opinion, especially given that Dr. McCabe did not treat Mr. D'Aries during the hospital stay that preceded his death. *Id.*

The Board determined that, despite Mrs. D'Aries's argument to the contrary, Dr. Quinn's extensive recounting of Mr. D'Aries's medical history left "little doubt" that he had reviewed Mr. D'Aries's claims file as instructed. *Id.* The Board also rejected Mrs. D'Aries's argument that Dr. Quinn did not give her the benefit of the doubt when rendering his opinion. The Board stated that the benefit of the doubt doctrine is a legal standard to be employed by an adjudicatory body, not by a medical professional. Finally, the Board found that Dr. Quinn's specialty in neurology clearly "render[ed] him qualified to address the effects of an organic brain disorder." R. at 7-8. The Board concluded that there was no competent medical evidence linking Mr. D'Aries's terminal illness to his military service and therefore denied Mrs. D'Aries's claim.

5

In her brief, Mrs. D'Aries makes three arguments. First, that the Board erred by relying on a medical advisory opinion that was inadequate for the following reasons: (1) the Board requested an opinion from an "internal medicine specialist" but received an opinion from a neurologist; (2) Dr. Quinn was directed by the Board to review Mr. D'Aries's claims file in its entirety, but he indicated in his report only that he had received a "chart" on Mr. D'Aries; and (3) "the Board violated the principles of fundamental fairness" by including in its request an explanation of the criteria for determining whether a condition was a principal or contributory cause of death but not advising that the benefit of the doubt must be given to a veteran on any material issue. Appellant's Br. at 8-10. Second, Mrs. D'Aries argues that the Board erred by failing to give weight to the fact that Dr. McCabe was Mr. D'Aries's treating physician for the nine years prior to his death. Appellant's Br. at 11. Finally, Mrs. D'Aries asserts that the Board erred in finding that VA complied with its duty to notify under the Veterans Claims Assistance Act because she was not given adequate notice prior to the initial adjudication of her claim. In this respect, she argues that the Board erred by relying on a post-decisional document, the May 2001 notice letter, to find that the duty to notify had been satisfied. Appellant's Br. at 13-14. Mrs. D'Aries requests that the Court vacate the Board's May 18, 2005, decision and remand the matter.

The Secretary, in his brief, argues that the Board's decision is supported by the evidence of record and is, therefore, not clearly erroneous. Specifically, the Secretary contends that the Board did not err in accepting an advisory medical opinion from a neurologist rather than from an internal medicine specialist. He asserts that, although the Board requested that an internal medicine specialist render this opinion, the chief of staff of the medical center to whom the request was sent determined that the appropriate medical expert to address the question was a neurologist. Secretary's Br. at 16. The Secretary next argues that Mrs. D'Aries has taken a single sentence in Dr. Quinn's opinion out of context in arguing that he did not review Mr. D'Aries's claims file, as he was directed to do by the Board's engagement letter. Secretary's Br. at 17. In this respect, he argues that it is clear from Dr. Quinn's "detailed opinion," which includes an "extensive and thorough review" of the medical evidence, that he had access to and reviewed the claims file prior to making his assessment. *Id.* As to Mrs. D'Aries argument regarding the benefit of the doubt doctrine, the Secretary contends that the doctrine is a statutory construct applicable only to those who are adjudicating a claim, not to medical professionals rendering opinions. Secretary's Br. at 18. The

6

Secretary next rejects Mrs. D'Aries "treating physician" argument, asserting that, not only has she not cited any authority to support her argument, but also she has ignored this Court's express rejection of such a rule in *Van Slack v. Brown*, 5 Vet.App. 499 (1993), and *Guerrieri v. Brown*, 4 Vet.App. 467 (1993). Secretary's Br. at 19-20. The Secretary further argues that any reliance by Mrs. D'Aries on *Padgett v. Nicholson*, 19 Vet.App. 133 (2005), *withdrawn*, 19 Vet.App. 334 (2005), *rev'd and remanded*, 473 F.3d 1364 (Fed. Cir. 2007), is misplaced, as that decision was withdrawn, and, in any event, that portion of the withdrawn decision on which she relies does not support her position. Secretary's Br. at 20-21. Finally, with regard to notice, the Secretary argues that Mrs. D'Aries's claim was initially adjudicated in 1999, prior to the passage of the Veterans Claims Assistance Act in 2000, and therefore timely notice was impossible. Secretary's Br. at 21. The Secretary notes that, following the enactment of the Veterans Claims Assistance Act, Mrs. D'Aries received compliant notice and was informed that she could submit additional evidence to substantiate her claim. *Id.* The Secretary asks the Court to affirm the May 18, 2005, Board decision.

## II. ANALYSIS

### A. Adequacy of the Medical Examination Sought by the Board

The text of 38 U.S.C. § 7109(a) provides: "When, in the judgment of the Board, medical expert opinion . . . is warranted by the medical complexity or controversy in an appeal case, the Board may secure an advisory medical opinion . . . ." The implementing regulation for section 7109 provides that "[t]he Board may obtain a medical opinion from an appropriate health care professional in the Veterans Health Administration or the Department of Veterans Affairs on medical questions involved in the consideration of an appeal when, in its judgment, such medical expertise is needed for equitable disposition of an appeal." 38 C.F.R. § 20.901(a) (2007). When the Board relies on such an opinion, that opinion must be adequate to allow judicial review. *See Green v. Derwinski*, 1 Vet.App. 121, 124 (1991) (holding that remand is appropriate where the Board relied on an inadequate medical examination report); *see also Hicks v. Brown*, 8 Vet.App. 417, 422 (1995) (concluding that an inadequate medical evaluation frustrates judicial review). An opinion is adequate where it is based upon consideration of the veteran's prior medical history and examinations and also describes the disability in sufficient detail so that the Board's "evaluation of the claimed disability will be a fully informed one." *Ardison v. Brown*, 6 Vet.App. 405, 407 (1994)

7

(quoting *Green*, 1 Vet.App. at 124). Whether a medical opinion is adequate is a finding of fact, which the Court reviews under the "clearly erroneous" standard. *See* 38 U.S.C. § 7261(a)(4); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990). "A factual finding 'is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Hersey v. Derwinski*, 2 Vet.App. 91, 94 (1992) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In rendering its decision, the Board is required to provide a written statement of the reasons or bases for its "findings and conclusions[] on all material issues of fact and law presented on the record." 38 U.S.C. § 7104(d)(1). The statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Gilbert*, 1 Vet.App. at 57. To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995). The Board may commit remandable error when it fails to provide an adequate statement of its reasons or bases. *See Gilbert*, 1 Vet.App. at 57.

### 1. Entitlement to Compliance with the October 2004 Engagement Letter

Mrs. D'Aries first argues that the medical advisory opinion was inadequate because, although the Board requested the opinion of an "internal medicine specialist," it received the opinion of a neurologist.[2] She asserts that this is a violation of this Court's ruling in *Stegall v. West*, which held

---

[2] The Court finds it necessary to point out that this issue was raised by counsel for the first time on appeal. At oral argument, counsel for Mrs. D'Aries conceded that he had not raised this precise issue to the Board, although he asserted that it was the Board's failure to provide Dr. Quinn's curriculum vitae that prevented him from doing so. However, the record reveals that counsel sought clarification of Dr. Quinn's "qualifications" by requesting his curriculum vitae from the Board in a December 2004 letter, as well as in an April 2005 letter. R. at 284, 292. The Board responded that it had "no information on Dr. Quinn" and therefore could not provide his curriculum vitae, an issue that counsel raised to the Board, but which the Board found meritless. R. at 288; *see* R. at 8. However, in the December 2004 letter, counsel also requested a copy of the engagement letter the Board sent to the Portland VA facility, and he received that document in early April 2005. R. at 288, 291. It is clear that counsel had notice that the Board requested a medical opinion from an internal medicine specialist, and that he had a copy of Dr. Quinn's report, which revealed him to be a member of the neurology department of the Portland VA Medical Center. R. at 288, 291-92. Further, in an April 2005 letter to the Board, while in possession of both the Board's engagement letter and Dr. Quinn's opinion, counsel objected to some aspects of Dr. Quinn's opinion–but *not* specifically to his speciality–and requested that the Board "*return the case to Dr. Quinn* for his review of the entire claims file and a new opinion which takes into consideration the benefit-of-the-doubt doctrine." R. at 292 (emphasis added). If counsel were concerned about the propriety of the Board relying on the opinion of a neurologist instead of an internal medicine specialist, one is hard pressed to understand why he would

8

that an order from this Court or the Board remanding an appeal for further action and adjudication confers upon a claimant the right to compliance with that order. 11 Vet.App. 268, 271 (1998); *see also Colayong v. West*, 12 Vet.App. 524, 533-34 (1999) (holding that reliance by the Board on a medical report that did not comply with the Board's remand order was improper).

The Secretary, in contrast, would have us find that *Stegall* does not apply because an engagement letter from the Board to a VA medical center requesting a medical opinion or examination under section 7109 and § 20.901 is factually distinct from a remand decision by the Board, and consequently cannot be given the same authoritative weight. However intriguing this question, it is one the Court need not address in order to resolve this case. This is so because, even assuming that *Stegall* controls, only substantial compliance with the terms of the Board's engagement letter would be required, not strict compliance. *See Dyment v. West*, 13 Vet.App. 141, 146-47 (1999) (holding that there was no *Stegall* violation when the examiner made the ultimate determination required by the Board's remand, because such determination "more than substantially complied with the Board's remand order"). Applying this rule to the instant case, the Court finds, as did the Board, that Dr. Quinn's opinion was sufficient to resolve the issue for which an advisory medical opinion was requested. Therefore, there has been substantial compliance with the Board's engagement letter.

First, the Board explicitly recognized in its decision that Dr. Quinn's "specialty [in neurology] alone renders him qualified to address the effects of an organic brain disorder." R. at 8. Additionally, the Board recounted Dr. Quinn's recitation of Mr. D'Aries's "extensive medical history," as well as the doctor's thorough explanation and rationale in reaching his conclusion that Mr. D'Aries's service-connected brain injuries did not cause or contribute to his death. *Id.* The Board concluded that, because Dr. Quinn "provided a thorough and detailed opinion about a disorder within his area of expertise, and [because] the opinion [was] consistent with the competent evidence o[f] record," his opinion was of "significant probative value." R. at 6. Finally, the Court takes judicial notice of the fact that neurology is the medical specialty that deals with the nervous system,

request that the neurologist provide a second, more thorough, opinion. As it is obvious that counsel had the necessary information to make this argument in a timely manner to the Board, the Court can only speculate as to why he did not do so. The Court reminds counsel that it has discretion regarding whether to entertain an argument raised for the first time on appeal (*see Maggitt v. West*, 202 F.3d 1370, 1377-78 (2000)), and that the Court has chosen to do so in this instance should not be interpreted by counsel as approval of his failure to raise a known issue below.

which includes the brain. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1285 (31st ed. 2007); *see also Smith (Brady) v. Derwinski*, 1 Vet.App. 235, 238 (1991) ("Courts may take judicial notice of facts not subject to reasonable dispute." (citing FED. R. EVID. 201(b))). Mr. D'Aries's service-connected injuries were related to the head and brain, and a neurologist is a specialist who could reasonably be expected to provide the appropriate medical analysis and opinion to resolve the question posed by the Board in its engagement letter: whether Mr. D'Aries's service-connected brain injuries caused or contributed to his death. In light of this discussion, the Court finds that Dr. Quinn's opinion substantially complied with the terms of the Board's October 2004 engagement letter. Consequently, even assuming that Mrs. D'Aries's argument regarding the applicability of *Stegall* to this factual situation is correct, because the Board recognized the deviation from its request, thoroughly analyzed the medical opinion provided, and provided sufficient reasons for its reliance thereon, the standard of compliance required by that case has been demonstrated here and there could be no error. *See Stegall*, 11 Vet.App. at 271; *Dyment*, 13 Vet.App. at 146-47.

### 2. Review of the Claims File

Mrs. D'Aries states that Dr. Quinn indicated only that he "received a chart on" Mr. D'Aries, which she contends is insufficient to comply with the Board's instruction that the examiner "review the claims file in its entirety." R. at 273, 281. The Board found that "[t]he extent to which [Dr. Quinn] reported [Mr. D'Aries's] extensive medical history . . . leaves little doubt that he reviewed the claims folder." R. at 7. The Court agrees with the Board. Following his initial statement that he received a chart on Mr. D'Aries, Dr. Quinn summarized Mr. D'Aries's medical history, spanning more than 50 years. He also referenced and quoted from numerous medical records, test results, and treatment notes. R. at 273. In his conclusion, he stated, "The record indicates that [Mr. D'Aries] sustained a severe head injury . . . resulting in chronic headaches and 'nervousness', but without cognitive or other neurologic deficits." R. at 274. As noted above, a medical opinion must be based upon consideration of the veteran's prior medical history and examinations and also describe the disability in enough detail for the Board to be able to make an informed decision. *See Ardison*, 6 Vet.App. at 407. Dr. Quinn's advisory medical opinion met this standard. Failure by a medical examiner to use the precise terminology "claims file" when indicating the records that he or she reviewed will not be fatal where, as here, it can be established from the facts that the claims file was, in fact, reviewed. In light of Dr. Quinn's thorough review of Mr. D'Aries's medical history, Mrs.

D'Aries has not demonstrated that the Board's factual determination that Dr. Quinn complied with its request to review Mr. D'Aries's claims file was clearly erroneous. *See Gilbert*, 1 Vet.App. at 52.

### 3. Requirement To Advise a Medical Examiner of the Benefit of the Doubt Doctrine

Finally, Mrs. D'Aries contends that Dr. Quinn's advisory medical opinion was inadequate because the Board "violated the principles of fundamental fairness" by not including a request that the medical expert give Mr. D'Aries the benefit of the doubt on material issues. Appellant's Br. at 10. Contrary to her argument, however, the benefit of the doubt doctrine is a legal construct to be applied by an adjudicatory body when the evidence is approximately balanced, not by a medical professional when rendering an opinion as to the cause of a veteran's death. *See* 38 U.S.C. § 5107(b). The express language of the statute makes it clear that it applies only to the adjudicatory process of the Secretary (and by extension, the Board) in the context of weighing information and evidence. *Id.* ("The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary . . . . When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, *the Secretary* shall give the benefit of the doubt to the claimant." (emphasis added)). Further, this Court has expressly held that the benefit of the doubt doctrine "does not apply during the process of submitting and gathering evidence." *Gilbert*, 1 Vet.App. at 55.[3] The Board was therefore under no obligation to request that the medical expert give the benefit of the doubt to the veteran, and, in fact, could not have appropriately requested that he do so because the benefit of the doubt doctrine is not applicable during the evidence-gathering phase of a case. *See id.* Therefore, the Court finds no error on this point.

For these reasons, the Court finds that the medical examination provided by Dr. Quinn was adequate for rating purposes, and that the Board's explanation for finding that opinion credible and adequate for rating purposes is supported by adequate reasons or bases. *See Gilbert*, 1 Vet.App. at

---

[3] At the time *Gilbert* was decided, the benefit of the doubt doctrine was codified at 38 U.S.C. § 3007(b) and provided:

> When, after consideration of all the evidence and material of record in a case before [VA] with respect to benefits under laws administered by [VA], there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each such issue shall be given to the claimant.

That provision was amended in May 1991 and redesignated as 38 U.S.C. § 5107(b).

11

57. Therefore, the Board's reliance on Dr. Quinn's opinion was not clearly erroneous. *See Ardison*, 6 Vet.App. at 407; *Gilbert*, 1 Vet.App. at 52.

B. Weight Assigned to the Opinion of Mr. D'Aries's Treating Physician

The Board is permitted to favor one medical opinion over another provided it gives an adequate statement of its reasons and bases for doing so. *See Simon v. Derwinski*, 2 Vet.App. 621, 622 (1992). The Board, of course, must explain its choice in a manner adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Gilbert*, 1 Vet.App. at 57. Credibility determinations are findings of fact to be made by the Board. *See Layno v. Brown*, 6 Vet.App. 465, 469 (1994) (finding that the weight and credibility of evidence "is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted"); *see also Washington v. Nicholson*, 19 Vet.App. 362 (2006) (holding that it is the Board's responsibility to determine the appropriate weight to be given to evidence). The Board's assessment of the credibility and weight to be given to evidence is a finding of fact that the Court reviews under the "clearly erroneous" standard of review. 38 U.S.C. § 7261(a)(4); *Wood v. Derwinski*, 1 Vet.App. 190, 193 (1991); *Gilbert*, 1 Vet.App. at 52.

Mrs. D'Aries argues that the Board erred by not giving additional weight to Dr. McCabe's opinion in light of his role as Mr. D'Aries's personal physician. In doing so, Mrs. D'Aries ignores this Court's express rejection of a "rule that gives the opinions of treating physicians greater weight in evaluating claims made by veterans." *Guerrieri*, 4 Vet.App. at 473; *see also Van Slack*, 5 Vet.App. at 502; *Harder v. Brown*, 5 Vet.App. 183, 188 (1993). Additionally, the Court notes that, by Dr. McCabe's own admission, he was not Mr. D'Aries's treating physician for the brain and head injuries at issue in this case. R. at 233. Mrs. D'Aries's reliance on this Court's decision in *Padgett*, 19 Vet.App. 133 (2005), *withdrawn*, 19 Vet.App. 334 (2005), *rev'd and remanded*, 473 F.3d 1364 (Fed. Cir. 2007), is misplaced because she misstates the holding of that case. *Padgett* gave no special weight to the medical opinions in that case based on a physician's role as treating physician. *See Padgett*, 19 Vet.App. at 148.

Turning to the general issue of the weight afforded by the Board to Dr. McCabe's opinion, the Court finds no error. In assigning "essentially no probative value" to Dr. McCabe's opinion, the Board engaged in extensive discussion of the conflicting medical evidence of record. R. at 6-8. The Board found that it could not determine whether Dr. McCabe had reviewed Mr. D'Aries's claims file

before rendering his October 2002 opinion. R. at 6. The Board also found that the October 2002 opinion contained "virtually no rationale" and failed to address how Mr. D'Aries's mental deterioration led to the sepsis and pneumonia that caused his death. R. at 6-7. Further, the Board noted "a level of inconsistency, with both the medical evidence and [Dr. McCabe's] own statements," in the three opinions provided by Dr. McCabe. R. at 7. Specifically, the Board noted that Dr. McCabe's December 1998 opinion included diabetes as a significant cause of death, but left that cause of death out of his two subsequent opinions. *Id.*; *see also* R. at 179, 233, 262. The Board also found that Dr. McCabe's December 2000 opinion, in which he stated that a combination of hypertension, renal disease, and cardiovascular disease caused Mr. D'Aries's mental deterioration, contradicted his October 2002 opinion, in which he stated that complications from organic brain syndrome led to Mr. D'Aries's deterioration and subsequent death. R. at 7; *see also* R. at 233, 262. Ultimately, the Board concluded that Dr. McCabe "demonstrated a willingness to render a medical opinion without a close and accurate review" of Mr. D'Aries's medical history, and thus found that his opinions lacked probative value. R. at 7.

In contrast, the Board found that Dr. Quinn's opinion was based on a review of Mr. D'Aries's complete claims file, that he was familiar with Mr. D'Aries's "extensive medical history," and that he provided "a thorough and detailed opinion about a disorder within his area of medical expertise" that was "consistent with competent evidence of record." R. at 6. In light of this discussion, and in light of the fact that it is the Board, not the Court, that is responsible for assessing the credibility and weight to be given to evidence, the Court cannot say that the Board's assignment of more probative value to Dr. Quinn's opinion than to Dr. McCabe's was clearly erroneous. *See Owens v. Brown*, 7 Vet.App. 429, 433 (1995); *Layno*, 6 Vet.App. at 469 . Further, the Court finds that the Board's decision was supported by adequate reasons or bases. *See Gilbert*, 1 Vet.App. at 57; *Caluza*, 7 Vet.App. at 506.

### C. Preadjudicatory Notice

Section 5103(a) of title 38, U.S. Code, requires that VA inform the claimant of (1) the information and evidence not of record that is necessary to substantiate the claim, (2) which portion of that information and evidence, if any, the claimant is expected to provide, and (3) which portion of that information and evidence, if any, VA will seek to obtain. 38 U.S.C. § 5103(a). The duty of affirmative notification under § 5103(a) "is not satisfied by various post-decisional communications

13

from which a claimant might have been able to infer what evidence [] VA found lacking in the claimant's presentation." *Mayfield v. Nicholson*, 444 F.3d 1328, 1333 (Fed. Cir. 2006). Whether a claimant has received adequate notice under the Veterans Claims Assistance Act is a "substantially factual determination" by the Board. *Id.* at 1333. Such a determination is reviewed under a "clearly erroneous" standard of review. *See Garrison v. Nicholson*, 494 F.3d 1366, 1370 (Fed. Cir. 2007) (holding that it is proper for this Court to review a Board finding that VA complied with the notice provisions of 38 U.S.C. § 5103(a) under a "clearly erroneous" standard of review).

Mrs. D'Aries argues that the Board erred in finding that VA complied with its duty to notify under the Veterans Claims Assistance Act. She contends only that, because the May 2001 notice letter was sent after the initial adjudication of her claim, she was not properly notified and the Board erroneously relied on a postdecisional document in reaching its conclusion. The Court disagrees. Mrs. D'Aries's argument fails to address the fact that the initial adjudication of her claim occurred in August 1999, more than one year before the Veterans Claims Assistance Act was enacted. At the time of the August 1999 adjudication of Mrs. D'Aries's claim, VA had no duty to provide such predecisional notice. This Court has held that where "notice was not mandated at the time of the initial [Agency of Original Jurisdiction] decision, the [Agency of Original Jurisdiction] did not err in not providing such notice specifically complying with section 5103(a)/§ 3.159(b)(1) because an initial [Agency of Original Jurisdiction] adjudication had already occurred." *Pelegrini v. Principi*, 18 Vet.App. 112, 120 (2004). However, where, as here, a claim was pending before VA at the time of the passage of the Veterans Claims Assistance Act, VA was required to provide compliant notice and readjudicate the claim. *Hupp v. Nicholson*, 21 Vet.App. 342, 350 (2007); *see also Prickett*, 20 Vet.App. at 377 (holding that a Veterans Claims Assistance Act timing error could be cured by issuance of compliant notice and a subsequent Statement of the Case); *Mayfield*, 444 F.3d at 1333-34 (holding that VA can cure timing defects through compliance with proper remedial measures). VA did this by issuing the May 2001 notice letter and the April 2002 Supplemental Statement of the Case. The May 2001 notice letter advised Mrs. D'Aries that she could submit additional information and evidence to support her claim, and, other than its timing, Mrs. D'Aries does not challenge the adequacy of that letter. The Court notes that Mrs. D'Aries submitted additional evidence, and, in April 2005, through counsel, expressly waived "any right to have the case remanded to the [r]egional [o]ffice for review of the new evidence and/or argument prior to a decision by the Board." R. at 291.

14

Because VA cured any error with respect to the timing of the notice given, and because Mrs. D'Aries does not challenge the sufficiency of the notice that was ultimately provided, the Court finds that the Board did not err in finding that VA complied with its duty to notify. *See Garrison*, 494 F.3d at 1370.

### III.  CONCLUSION

On consideration of the foregoing, the May 18, 2005, Board decision is AFFIRMED.


HAGEL, *Judge*, concurring in the result:  I concur in the conclusion of the Court that the medical opinion provided by Dr. Quinn substantially complied with the terms of the Board's October 2004 engagement letter, and for the reasons set forth in the per curiam decision.  I write separately only to express my belief that there is, in practical terms, no difference between a remand decision by the Board directing that a medical examination or opinion be performed or obtained and an engagement letter issued by the Board requesting the same, and therefore *Stegall* controls in this instance.

In my view, the Board's October 2004 engagement letter was as much a directive regarding the specialty of the medical examiner as would be a remand decision: The letter was signed by an agent of the Secretary who identified herself as an "Acting Veterans Law Judge" (R. at 282); it posed a particular medical question to be answered by the specialist (R. at 281); the purpose of the requested medical opinion was to serve as the basis for an adjudication by the Board (*see* R. at 282); the chief of staff of a VA medical center was required to comply with the request by selecting a physician to answer the question posed (*see Medical Review Assistance to Board of Veterans Appeals Cases*, VHA Directive 2000-049 at 1 (Dec. 13, 2000) [hereinafter VHA Directive]; 69 Fed. Reg. 19,935, 19,936); the resulting medical opinion had to be returned to the Board (*see* R. at 282; VHA  Directive 2000-049 at 2); and the opinion was, in fact, used–by the same acting Board member who requested the opinion–as the basis for the Board's adjudication of Mrs. D'Aries's claim (R. at 6, 8).

My colleague's contrary statement below notwithstanding, I take no position regarding the Board's competence or authority under § 20.901 to specify that a medical examination or opinion be performed or provided by a medical professional with a particular specialty, as that issue need

15

not be addressed at this time. As is clear from the brief discussion above, I simply see no basis on which to distinguish an instruction in a remand decision that a physician of a particular medical specialty perform an examination or render an opinion from an identical instruction in an engagement letter. Accordingly, I would hold that an engagement letter from the Board to a VA medical facility requesting a medical examination or opinion confers on a claimant the right to compliance with the terms of that request. *See Stegall*, 11 Vet.App. at 271.

LANCE, *Judge*, concurring in the result: I concur in the result reached by the Court, but write separately simply to state that my colleague, in his concurring statement, assumes that the Board is vested with the authority to specify the appropriate medical expert to answer the medical question(s) forming the basis of the § 20.901(a) request. As a corollary, he necessarily assumes that the Board is competent to make that determination. I do not believe that the authorities presented to the Court at this juncture provide definitive support for either proposition. *Compare* 38 C.F.R. § 20.901(a) (providing that the Board, in its discretion, may obtain a medical opinion from "an appropriate health care profession in the Veterans Health Administration [(VHA)] or the Department of Veterans Affairs"), *with Medical Review Assistance to Board of Veterans Appeals Cases*, VHA Directive 2000-049 1-2 (Dec. 13, 2000)[4] ("[The Board] will select VA medical centers with the appropriate medical expertise indicated in the listing [provided by VHA]. Each [Board] request will clearly and concisely state the *medical questions(s) for which a medical advisory opinion is being sought*." (emphasis added)), *and* Board of Veterans' Appeals: Rules of Practice–Medical Opinions from the Veterans Health Administration, 69 Fed. Reg. 19,935, 19,936 (Apr. 15, 2004) (codified at 38 C.F.R. § 20.901(a)) ("[T]he ultimate selection of the physician asked to render the opinion is left to the Office of the Chief of Staff of that facility. In other words, the selection of the physician is a process that is in fact overseen by VHA management."), *and* 38 U.S.C. § 7109(b) (providing that, in the case of an independent medical opinion, "the actual selection of the expert or experts to give the advisory medical opinion in an individual case shall be made by an appropriate official of such institution"); *see also Stefl v. Nicholson*, 21 Vet.App. 120, 124 (2007) (holding that the Board must

---

[4] VHA Directive 2000-049 has been superseded by directive 2006-019, which remains substantively the same. *See Medical Review Assistance to Board of Veterans Appeals Cases*, VHA Directive 2006-019 (Apr. 3, 2006).

16

consider whether a medical opinion contains "such sufficient information that it does not require the Board to exercise independent medical judgment"); *McLendon v. Nicholson*, 20 Vet.App. 79, 85 (2006) (noting that "the degree of . . . injury and whether any disabilities resulted therefrom are medical assessments that the Board is not competent to render in the first instance"); *Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991) (holding that the Board may only consider independent medical evidence and may not substitute its own medical opinion). However, as Mrs. D'Aries has failed to persuasively argue that the medical opinion the Board received was inadequate or that the Board did not provide an adequate statement of reasons or bases supporting its decision to ultimately rely on that opinion, we need not address these issues at this time.