Citation Nr: 1132152 
Decision Date: 08/31/11 Archive Date: 09/07/11

DOCKET NO. 03-27 657 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Huntington, West Virginia


THE ISSUE

Entitlement to service connection for cerebellar ataxia.


REPRESENTATION

Appellant represented by: The American Legion


WITNESSES AT HEARING ON APPEAL

The Veteran, L.N., J.L., and J.S.


ATTORNEY FOR THE BOARD

Douglas E. Massey, Counsel


INTRODUCTION

The Veteran had active military service from February 1966 to April 1969.

This appeal to the Board of Veterans' Appeals (Board/BVA) is from a June 2002 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Huntington, West Virginia.

This case has been before the Board on several prior occasions. In February 2004 the Veteran testified at a hearing before the undersigned Veterans Law Judge of the Board. Thereafter, in July 2004, the Board remanded the claim to the RO via the Appeals Management Center (AMC) for further development and consideration. Following that development, the Board issued a December 2007 decision denying the claim. The Veteran appealed that decision to the U.S. Court of Appeals for Veterans Claims (Court/CAVC).

In a May 2008 Order, the Court granted the Secretary's motion and vacated the Board's decision and remanded the claim to the Board for still further development and readjudication in compliance with directives specified. And to comply with the Court's Order, the Board in turn again remanded the claim to the RO via the AMC in November 2008. Since, however, there was not compliance with the Board's remand directives, the Board remanded the claim, yet again, in June 2010 to obtain additional necessary information. See Stegall v. West, 11 Vet. App. 268 (1998) (holding that the Veteran is entitled, as a matter of law, to compliance with remand directives).

After finally complying with the Board's remand directives, including obtaining additional medical comment concerning this case in August 2010, the AMC readjudicated the claim in the June 2011 supplemental statement of the case (SSOC) and continued to deny the claim before returning the file to the Board for further appellate consideration.



FINDINGS OF FACT

1. The Veteran's cerebellar ataxia first appeared between 1977 and 1979, several years after his military service had ended in 1969, and the most probative evidence indicates his cerebellar ataxia was not caused by or a result of his military service, including especially the single seizure, i.e., generalized convulsion, he had experienced in May 1967.

2. Commenting neurologists have indicated the cerebellar ataxia instead is most likely the result of the Veteran's chronic alcoholism.

3. Cerebella ataxia also is not included on the list of diseases presumptively associated with exposure to Agent Orange in the Republic of Vietnam during the Vietnam era, and there is no competent and credible evidence otherwise establishing this linkage on a direct basis.


CONCLUSION OF LAW

The Veteran's cerebellar ataxia was not incurred in or aggravated by his military service and may not be presumed to have been incurred in service. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 5107 (West 2002 & Supp. 2010); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2010).



REASONS AND BASES FOR FINDINGS AND CONCLUSION

I. The Duties to Notify and Assist

Before addressing the underlying merits of a claim, the Board is required to ensure that VA's duty-to-notify and duty-to-assist obligations have been satisfied under the Veterans Claims Assistance Act of 2000 (VCAA). See 38 U.S.C.A. §§ 5103, 5103A (West 2002); 38 C.F.R. § 3.159 (2010). Proper notice from VA must inform the claimant of any information and medical or lay evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will obtain and assist the claimant in obtaining; and (3) that the claimant is expected to provide. 38 C.F.R. § 3.159(b)(1). Quartuccio v. Principi, 16 Vet. App. 183 (2002).

These VCAA notice requirements apply to all five elements of a service-connection claim: (1) Veteran status; (2) existence of a disability; (3) a connection between the Veteran's service and the disability; (4) degree of disability; and (5) effective date of the disability. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006), aff'd sub nom. Hartman v. Nicholson, 483 F.3d 1311 (2007). Further, this notice must include information that a downstream disability rating and an effective date for the award of benefits will be assigned if service connection is granted. Id., at 486.

The duty to notify has been satisfied in this particular instance by way of letters to the Veteran dated in August 2001, July 2004, February 2009, and June 2010, which properly informed him of the evidence required to substantiate his claim and apprised him of his and VA's respective responsibilities in obtaining this supporting evidence. The first letter was issued prior to the initial adjudication of his claim in June 2002, so in the preferred sequence. See Pelegrini v. Principi, 18 Vet. App. 112, 120 (2004). And although the additional letters were not, his claim has been readjudicated by the AMC in the June 2011 SSOC, so since providing even those additional notices. See Prickett v. Nicholson, 20 Vet. App. 370, 376 (2006) (the issuance of a fully compliant VCAA notification followed by readjudication of the claim, such as in a statement of the case (SOC) or supplemental SOC (SSOC), is sufficient to rectify ("cure") a timing defect where there was no notice prior to the initial adjudication of the claim or the notice, if provided, was incomplete). See also Mayfield v. Nicholson, 499 F.3d 1317, 1323 (Fed. Cir. 2007) (Mayfield IV). As the pleading party, the Veteran, not VA, has the burden of proof of showing there is VCAA notice error in timing or content and, moreover, that it is unduly prejudicial, meaning outcome determinative of his claim. See Shinseki v. Sanders, 129 S. Ct. 1696 (2009). There is no such pleading or allegation in this instance.

VA also fulfilled its duty to assist the Veteran by obtaining all relevant evidence in support of his claim. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159. VA has obtained all medical and other records that he and his representative have cited as potentially relevant. He was also afforded several VA examinations, including by neurologists, to determine whether his cerebellar ataxia is related to his military service, and especially to the seizure he had during service in May 1967. See McLendon v. Nicholson, 20 Vet. App. 79 (2006); 38 U.S.C.A. § 5103A(d)(2); 38 C.F.R. § 3.159(c)(4). The first examination was in April 2005. However, the Court vacated the Board's December 2007 decision, relying on that examination, because the examiner had determined it was "unclear" whether there was this causality, so had not provided the requested medical comment on this determinative issue. See generally Barr v. Nicholson, 21 Vet. App. 303, 311 (2007) (holding that once VA undertakes the effort to provide an examination for a 
service-connection claim, even if not statutorily obligated to do so, it must provide an adequate one or, at a minimum, notify the claimant why one will not or cannot be provided). And see Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007) ("[A] medical opinion ... must support its conclusion with an analysis that the Board can consider and weigh against contrary opinions.").

As a result, that same VA examiner, who is a neurologist, examined the Veteran again in June 2009 and provided this requested medical opinion. But since he did not discuss the underlying rationale for his opinion, the Board obtained an addendum opinion from this same VA neurologist in August 2010. And this doctor's opinions, in the aggregate, comply with the Court's May 2008 Order and the Board's remand directives. See D'Aries v. Peake, 22 Vet. App. 97, 105 (2008).

Accordingly, the Board concludes that VA has satisfied its duties to notify and assist the Veteran with his claim. Therefore, the Board may proceed with the adjudication of the claim. 38 U.S.C.A. § 5103A(a)(2); 38 C.F.R. § 3.159(d).

II. Legal Criteria

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active military service in the line of duty. See 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303(a). Stated somewhat differently, service connection requires: (1) competent and credible evidence confirming the Veteran has the claimed disability or at least has since filing his claim; (2) competent and credible evidence of in-service incurrence or aggravation of a relevant disease or injury; and (3) competent and credible evidence of a nexus (i.e., link) between the claimed in-service disease or injury and the current disability. See Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004), citing Hansen v. Principi, 16 Vet. App. 110, 111 (2002).

The chronicity provision of 38 C.F.R. § 3.303(b) is applicable where the evidence, regardless of its date, shows the Veteran had a chronic condition in service or during an applicable presumptive period per 38 C.F.R. §§ 3.307, 3.309 and still has such condition. If, however, chronicity (permanency) of disease or injury in service is not shown or is legitimately questionable, then a showing of continuity of symptomatology following service is required to support the claim. Establishing continuity of symptomatology under 38 C.F.R. § 3.303(b) is an alternative method of satisfying the second and third Shedden requirements to show chronicity of disease or injury in service and in turn link current disability to service. See also Clyburn v. West, 12 Vet. App. 296, 302 (1999).


Evidence relating a current disorder to service must be medical unless it concerns a disorder that may be competently demonstrated by lay observation. Savage v. Gober, 10 Vet. App. 488, 498 (1997). Lay testimony is competent to establish the presence of observable symptomatology and "may provide sufficient support for a claim of service connection." Layno v. Brown, 6 Vet. App. 465, 469 (1994). When, for example, a condition may be diagnosed by its unique and readily identifiable features, the presence of the disorder is not a determination "medical in nature" and is capable of lay observation. In such cases, the Board is within its province to weigh the testimony and make a credibility determination as to whether the evidence supports a finding of service incurrence and continuity of symptomatology sufficient to establish service connection. See Barr v. Nicholson, 21 Vet. App. 303 (2007).

Lay evidence can be competent and sufficient to establish a diagnosis of a condition when: (1) a layperson is competent to identify the medical condition (e.g., a broken leg, separated shoulder, tinnitus (ringing in the ears), varicose veins, pes planus (flat feet)), (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007).

So medical evidence is not always or categorically required when the determinative issue involves either medical diagnosis or etiology, but rather such issue may, depending on the facts of the case, be established by competent and credible lay evidence under 38 U.S.C.A. § 1154(a). See Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009).

Therefore, ultimately, the determination as to whether medical evidence is needed to demonstrate that a Veteran presently has the same condition he or she had in service or during a presumptive period, or whether lay evidence will suffice, depends on the nature of the Veteran's present condition (e.g., whether the Veteran's present condition is of a type that requires medical expertise to identify it as the same condition as that in service or during a presumptive period, or whether it can be so identified by lay observation). Savage, 10 Vet. App. at 494-97.

Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes the disease was incurred in service. 38 C.F.R. § 3.303(d).

Certain chronic diseases, such as organic disease of the nervous system, will be presumed to have been incurred in service if manifested to a compensable degree (meaning to at least 10-percent disabling) within one year of separation from service. This presumption, however, is rebuttable by affirmative evidence to the contrary. See 38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307, 3.309(a).

Also, a Veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the Vietnam era shall be presumed to have been exposed during such service to an herbicide agent, such as Agent Orange, unless there is affirmative evidence establishing that he or she was not exposed to any such agent during that service. See 38 C.F.R. § 3.307(a)(6)(iii).

And if a Veteran was exposed to Agent Orange during active military, naval, or air service, certain specified diseases shall be presumptively service connected, if the requirements of 38 C.F.R. § 3.307(a) are met, even if there is no record of such disease during service. 38 C.F.R. § 3.309(e). This list of diseases includes: chloracne or other acneform disease consistent with chloracne, Type 2 Diabetes Mellitus (also referred to as adult-onset diabetes), Hodgkin's disease, multiple myeloma, non-Hodgkin's lymphoma, acute and subacute peripheral neuropathy, porphyria cutanea tarda, prostate cancer, respiratory cancers, soft-tissue sarcoma, ischemic heart disease, Parkinson's disease, and B-cell leukemias. 38 U.S.C.A. § 1116; 38 C.F.R. §§ 3.307(a)(6)(ii), 3.309(e) (2009 and Supp. 2010); see Notice, 75 Fed. Reg. 168, 53202-16 (Aug. 31, 2010).

Furthermore, even if a Vietnam era Veteran does not have one of these presumptive diseases, he or she still may establish his or her entitlement to service connection with proof of actual direct causation. See Combee v. Brown, 34 F.3d 1039 (Fed Cir. 1994) and McCartt v. West, 12 Vet. App. 164, 167 (1999).

III. Analysis

The Veteran has presented two theories in support of his claim. First, he claims that his cerebellar ataxia is directly related to his military service and, in particular, to a generalized convulsion (i.e., seizure) he experienced in May 1967. Second, he claims that service connection is warranted on a presumptive basis because he was exposed to Agent Orange while serving in Vietnam. For the reasons and bases set forth below, however, the Board finds no grounds to grant the claim on either this alleged direct or presumptive basis.

The Veteran's claim fails under a presumptive theory of service connection because, while he did serve in Vietnam during the Vietnam era, and therefore it is presumed he was exposed to Agent Orange while there, cerebellar ataxia is not included on the list of diseases in 38 C.F.R. § 3.309(e) presumptively associated with said exposure. The Secretary of VA has specifically determined there is no positive association between exposure to herbicides and any other condition for which the Secretary has not specifically determined that a presumption of service connection is warranted. See Notice, 68 Fed. Reg. 27630-27641 (2003).

There equally is not the required medical nexus evidence otherwise establishing this required linkage or correlation between his cerebellar ataxia and his presumed exposure to Agent Orange on a direct basis, either. See again Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994); and McCartt v. West, 12 Vet. App. 164, 167 (1999) (wherein the Court held that the provisions set forth in Combee, which instead concerned radiation exposure, are nonetheless equally applicable in cases involving claimed Agent Orange exposure).

And regarding the claimed direct relationship between the seizure he had in service in May 1967 and his cerebellar ataxia, the most probative evidence in the file is also unsupportive of the claim on this remaining alternative basis, as well. See Watson v. Brown, 4 Vet. App. 309, 314 (1993) ("A determination of service connection requires a finding of the existence of a current disability and a determination of a relationship between that disability and an injury or a disease incurred in service."). See also Maggitt v. West, 202 F.3d 1370, 1375 (Fed. Cir. 2000); D'Amico v. West, 209 F.3d 1322, 1326 (Fed. Cir. 2000); Hibbard v. West, 13 Vet. App. 546, 548 (2000); and Collaro v. West, 136 F.3d 1304, 1308 (Fed. Cir. 1998).

The Veteran's service treatment records (STRs) confirm an episode of what at least initially appeared to have been a seizure in May 1967. He was immediately admitted for observation for two days and later transferred to another hospital, where he was observed for over one month. Follow-up examinations and additional clinical work up, which included neurological and radiological studies as well as an electroencephalogram (EEG), were all within normal limits. He was reevaluated in October 1967, at which time his chest plate, skull X-rays, and EEGs were all again within normal limits. The diagnosis was generalized convulsions (by history only, initial solitary episode). In January 1968 he was removed from anti-epileptic medication after being symptom-free. During his subsequent military separation examination in April 1969, so more than a year later, he did not report any then current problems with seizures or any other neurological disorder. His military service ended that same month.

The Veteran alleges he eventually developed cerebellar ataxia as a result of the seizure he had experienced in service. Service connection is not in effect for a seizure disorder and, indeed, was specifically denied in a prior June 2001 Board decision. Decisions of the Board are final and binding unless appealed, the Chairman orders reconsideration of the decision, or there is some other exception, such as the decision involved clear and unmistakable error (CUE), none of which has been alleged or is applicable in this particular instance. See 38 C.F.R. §§ 20.1000, 20.1100, 20.1400, etc.

So there necessarily cannot be service connection of the cerebellar ataxia, as secondary to the seizure disorder, because the seizure disorder itself has not been determined to be related to the Veteran's military service, so not an underlying service-connected disability. See 38 C.F.R. § 3.310(a) and (b) (permitting secondary service connection for disability that is proximately due to, the result of, or aggravated by a service-connected disability). 

There is no objective or documented indication of cerebellar ataxia for several years following the Veteran's separation from active duty in 1969, at least until sometime between 1977 and 1979. The U. S. Court of Appeals for the Federal Circuit (Federal Circuit Court), however, has recognized lay evidence as potentially competent to support the presence of the claimed disability, both during service and since, even where not corroborated by contemporaneous medical evidence such as actual treatment records. See Buchanan v. Nicholson, 451 F.3d 1331, 1335 (Fed. Cir. 2006). But the Federal Circuit Court went on to hold in Buchanan that the Board retains the discretion to make credibility determinations and otherwise weigh the evidence submitted, including lay evidence. That is to say, the Board must still weigh lay statements and testimony, even if competent, against the medical and other evidence in the file to determine which is most probative, so including additional consideration of the credibility of the evidence. See Rucker v. Brown, 10 Vet. App. 67 (1997) and Layno v. Brown, 6 Vet. App. 465 (1994) (distinguishing between competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted")). The Federal Circuit Court has recognized the Board's "authority to discount the weight and probity of evidence in light of its own inherent characteristics and its relationship to other items of evidence." Madden v. Gober, 125 F.3d 1477, 1481 (Fed. Cir. 1997).

The Board therefore may consider the absence of any indication of a relevant medical complaint until so relatively long after service as one factor, though not the only or sole factor, in determining whether a disease or an injury in service resulted in chronic or persistent residual disability. See Maxson v. West, 12 Vet. App. 453, 459 (1999), aff'd sub nom. Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000). Cf. Forshey v. Principi, 284 F.3d 1335, 1358 (Fed. Cir. 2002) (en banc) (cautioning that negative evidence, actual evidence that weighs against a party, must not be equated with the absence of substantive evidence). Ultimately, the Board must consider all the evidence relevant to the claim, including the availability of medical records, the nature and course of the disease or disability, the amount of time that has elapsed since military service, and any other pertinent facts. Cf. Dambach v. Gober, 223 F.3d 1376, 1380-81 (Fed. Cir. 2000). Thus, when appropriate, the Board may consider the absence of evidence when engaging in a fact-finding role. See Jordan v. Principi, 17 Vet. App. 261 (2003) (Steinberg, J., writing separately) (noting that the absence of evidence may be considered as one factor in rebutting the aggravation part of the section 1111 presumption of soundness).

Here, the medical evidence, which also must be considered, indicates the Veteran's cerebellar ataxia is unrelated to his military service - and, in particular, to his initially suspected seizure in May 1967. Instead, according to the neurologists that have had occasion to review the evidence in this case and his specific situation and circumstances, the most likely cause of his cerebellar ataxia is his chronic alcoholism (alcohol abuse). And just as in the case of his seizure disorder, the Board already has determined in July 2004 that his primary alcohol abuse is not service connectable as a matter of law since due to his willful misconduct and, thus, not a disability incurred or aggravated in the line of duty during his active military service. 38 U.S.C.A. §§ 105(a), 1110; 38 C.F.R. §§ 3.1(m), 3.301(a), (d). See also Allen v. Principi, 237 F.3d 1368 (Fed. Cir. 2001) (only permitting service connection for alcohol abuse acquired as secondary to a 
primary service-connected disability, such as a mental disorder like posttraumatic stress disorder (PTSD), not in this reverse scenario where the alcohol abuse, instead, has caused or aggravated the disability in question). See, too, VAOPGCPREC 7-99 (June 9, 1999); VAOPGCPREC 2-98 (Feb. 10, 1998).

In this regard, VA treatment records show the Veteran was treated for alcoholism and chronic alcohol dependence beginning in December 1988. However, the first documented evidence of ataxia is in a May 1991 report, which notes his 12-year history (meaning since 1979) of difficulty balancing and weakness in both legs. The diagnostic impression was cerebellar atrophy secondary to alcohol abuse.

Several private physicians also have attributed the Veteran's cerebellar ataxia to his chronic alcoholism. As evidence of this, records from C.L., M.D., show treatment in 1994 and 1995 for chronic cerebellar ataxia secondary to alcohol abuse. 

In a May 1994 report, Dr. C.L. reiterated that "by far the most likely cause of this [generalized ataxia without nystagmus] is an alcoholic cerebellar degeneration as a result of chronic alcohol abuse." In a June 1995 report, Dr. C.L.'s impression was "[c]hronic cerebellar ataxia possibly secondary to ethanol abuse." 

In records dated in 2002 and 2003, P.S., M.D., confirms the Veteran's cerebellar ataxia is secondary to alcoholism. An October 2002 report notes his 
25-year history of gait and speech disturbance due to "chronic insidious progressive ataxia of gait, speech, and (lower greater than upper with mild 'crossed' asymmetries) in context of chronic alcoholism and MRI classical for alcoholic cerebellar degeneration." In other words, Dr. P.S. clearly relates the Veteran's cerebellar ataxia to alcoholism, which had first appeared some 25 years earlier (meaning in 1977 or thereabouts). The Board also sees that Dr. P.S. mentions an even earlier history of an alcohol-related seizure when the Veteran was 19, thereby suggesting that his generalized convulsion in May 1967 may also have been due to his alcohol abuse.

In addition to these two private physicians' opinions, a VA neurologist came to the same conclusion that the Veteran's cerebellar ataxia is unrelated to his military service but, instead, most likely due to his chronic alcoholism. In April 2005, this commenting VA neurologist reviewed the claims file and examined the Veteran before concluding that the source of the Veteran's ataxia "is due to cerebellar degeneration, however the etiology is unclear." This VA neurologist then explained that, "[a]lthough alcohol can induce cerebellar degeneration, there is also the possibility that the Veteran may have a primary cerebellar ataxia such as cerebellar cortical atrophy or related sporadic cerebellar degeneration." This neurologist goes on to note that, while the Veteran had an isolated seizure in service, "I don't think he has an ongoing seizure disorder." 


The Court, as already alluded to, vacated the Board's December 2007 decision relying on this opinion to deny the claim because this VA neurologist did not, in actuality, discuss whether "it is at least as likely as not that [the Veteran's] ataxia is related to his service in the military." Furthermore, concluded the Court, this VA neurologist did not address whether the Veteran's ataxia is related to his generalized convulsion during service in May 1967." As a result, following a Board remand in November 2008 to obtain this necessary medical comment on this determinative issue of causation, this same VA neurologist again reviewed the claims file and reexamined the Veteran in June 2009. This VA neurologist confirmed the diagnosis of "Ataxia, most likely due to cerebellar degeneration." But more importantly, he then provided the following opinion:

The Veteran's cerebellar atrophy is related to either alcohol[-]induced cerebellar degeneration or may represent a primary cerebellar degeneration seen in conditions such as Olivo-ponto-cerebellar atrophy (OPCA). In either case, the ataxia is not related, in my opinion, to his military service. Also the ataxia is not related to the single generalized convulsion he experienced during May of 1967. It is recommended that the Veteran have an MRI of the brain performed to document whether there is any cerebellar and/or brain stem atrophy present.

Because, however, there was not sufficient discussion of the underlying medical rationale for even this additional opinion, and since this examiner had suggested the Veteran may need to undergo additional testing and evaluation in the way of an MRI of his brain, the Board again remanded this claim in June 2010.

In an addendum report prepared in August 2010, in response (this report apparently is mistakenly dated in August 2009), this same commenting VA neurologist explained that he had AGAIN REVIEWED the claims folder and that, once again, his conclusions are thus: 1. Ataxia of cerebellar origin, NOT caused by, or a result of [the Veteran's] military service, 2. Ataxia of cerebellar origin, NOT caused by, or a result of seizure disorder. And as rationale, this commenting VA neurologist indicated: "1. The gait difficulty began 9 years AFTER military service and there was no inciting event during service to cause this difficulty, and 2. A single seizure does NOT cause ataxia." 

This commenting VA neurologist therefore provided the necessary medical rationale for his opinion as to why the Veteran's cerebellar ataxia is not related to his military service, including especially to the generalized convulsion (seizure) he experienced in service in May 1967. This VA neurologist's review of the pertinent medical history combined with his rationale renders his opinion highly probative. See Nieves-Rodriguez, 22 Vet. App. 295, 305-06 (2008), citing Stefl v. Nicholson, 21 Vet. App. 120, 125 (2007) (holding that "a mere conclusion by a medical doctor is insufficient to allow the Board to make an informed decision as to what weight to assign to a doctor's opinion"); Miller v. West, 11 Vet. App. 345, 348 (1998) ("A bare conclusion, even one reached by a health care professional, is not probative without a factual predicate in the record."); see also Dennis v. Nicholson, 21 Vet. App. 18, 22 (2007) ("The Court has long held that merely listing evidence before stating a conclusion does not constitute an adequate statement of reasons and bases." (citing Abernathy v. Principi, 3 Vet. App. 461, 465 (1992)). 

This opinion clearly reflects this VA neurologist's belief that the Veteran's cerebellar ataxia is unrelated to his military service, regardless of whether it is due to alcoholism or some other cause, including the generalized convulsion he experienced in service. And this commenting VA neurologist also made a point of indicating that two other neurologists had come to this same conclusion, which is especially noteworthy because they have specialized training and expertise in the specific branch of medicine at issue. See Wray v. Brown, 7 Vet. App. 488, 493 (1995) (holding that the adoption of an expert medical opinion may satisfy the Board's statutory requirement of an adequate statement of reasons and bases if the expert fairly considered the material evidence seemingly supporting the Veteran's position).


Cerebellar ataxia is not the type of condition that is readily amenable to mere lay diagnosis or probative comment on its etiology. See Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007) (reiterating this axiom in a claim for rheumatic heart disease). And the medical opinions that are competent and credible concerning this determinative issue of causation are overwhelmingly against the claim. Therefore, since the preponderance of the evidence is against the claim, the doctrine of reasonable doubt is not for application, and the claim must be denied. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990).


ORDER

The claim for service connection for cerebellar ataxia is denied.



____________________________________________
KEITH W. ALLEN
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs