# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 18-2928

MICHAEL L. CHAVIS, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued November 20, 2019                                        Decided April 16, 2021)

*Zachary M. Stolz* and *Kaitlyn C. Degnan*, who was on the brief, both of Providence, Rhode Island, for the appellant.

*Clifton A. Prince*, Appellate Attorney, with whom *James M. Byrne*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Sarah W. Fusina*, Deputy Chief Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before BARTLEY, *Chief Judge*, and MEREDITH and FALVEY, *Judges*.

BARTLEY, *Chief Judge*, filed the opinion of the Court. MEREDITH, *Judge*, filed an opinion concurring in part and dissenting in part.

BARTLEY, *Chief Judge*: Veteran Michael L. Chavis appeals, through counsel, an April 20, 2018, Board of Veterans' Appeals (Board) decision that denied entitlement to a disability evaluation higher than 40% for a low back strain with herniated nucleus pulposus at the L4-L5 spinal level and denied entitlement to evaluations higher than 20% for right and left lower extremity radiculopathy associated with the lumbar spine disability. Record (R.) at 2-15.[1,2] This

---

[1] In the same decision, the Board granted increased initial evaluations for the bilateral radiculopathy from 10% to 20% and entitlement to a total disability evaluation based on individual unemployability (TDIU) from February 1, 2017. R. at 12-13. Because these determinations are favorable to Mr. Chavis, the Court will not disturb them. *See Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007) ("The Court is not permitted to reverse findings of fact favorable to a claimant made by the Board pursuant to its statutory authority."), *aff'd in part, dismissed in part sub nom. Medrano v. Shinseki*, 332 F. App'x 625 (Fed. Cir. 2009). In addition, the Board remanded the issue of entitlement to TDIU on an extraschedular basis prior to February 1, 2017. R. at 14-15. Because a remand is not a final decision of the Board subject to judicial review, the Court does not have jurisdiction to consider this issue at this time. *See Howard v. Gober*, 220 F.3d 1341, 1344 (Fed. Cir. 2000); *Breeden v. Principi*, 17 Vet.App. 475, 478 (2004) (per curiam order); 38 C.F.R. § 20.1100(b) (2020).

[2] The Secretary filed the record of proceedings on June 20, 2019, but subsequently filed an amended record on July 2, 2019. All references to the record of proceedings refer to the amended record.

matter was referred to a panel of this Court, with oral argument,[3] to address whether the requirement of ankylosis in VA's General Rating Formula for Diseases and Injuries of the Spine (General Rating Formula), 38 C.F.R. § 4.71a (2020), can be met with evidence of the functional equivalent of ankylosis during a flare. We hold that it can. Because the Board did not consider whether Mr. Chavis's symptoms resulted in the functional equivalent of ankylosis, the Court will set aside that portion of the April 2018 Board decision that denied a higher evaluation for the lumbar spine disability and remand that matter to the Board for adjudication consistent with this decision.

In addition, we address a second question: whether the Board had jurisdiction over the evaluation of Mr. Chavis's radiculopathy disabilities. Because we conclude that the Board had jurisdiction over the radiculopathy increased-evaluation issue, and because the parties agree that the Board's determination on the merits of that issue was not supported by adequate reasons or bases, the Court will set aside that portion of the April 2018 Board decision that denied evaluations higher than 20% for right and left lower extremity radiculopathy and remand that matter to the Board for adjudication consistent with this decision.

## I. FACTUAL BACKGROUND

Mr. Chavis served honorably in the U.S. Army from May 1975 to April 1976. R. at 3106. In August 1976, a VA regional office (RO) awarded service connection for a low back strain and assigned an initial noncompensable evaluation. R. at 3810; *see* R. at 3820-21 (July 1976 VA examination report reflecting a diagnosis of recurrent low back strain, negative Lasègue sign bilaterally,[4] and normal deep tendon reflexes).

In January 1999, the RO recharacterized the lumbar spine disability as a low back strain with herniated nucleus pulposus at the L4-L5 spinal level and increased the evaluation to 20%. R. at 3589-90. In its decision, the RO referenced a March 1998 MRI, noting that results were "questionable whether [Mr. Chavis] had symptoms of a left L5 radiculopathy." R. at 3590.

---

[3] *Chavis v. Wilkie*, U.S. Vet. App. No. 18-2928 (oral argument held Nov. 20, 2019), https://www.youtube.com/watch?v=-1UWBM3uiEY) [hereinafter Oral Argument].

[4] The Lasègue test is also called the straight leg-raising test. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 993, 1871 (33d ed. 2019) [hereinafter DORLAND'S]. A positive Lasègue sign or a positive straight leg-raising test are indications of lumbar radiculopathy. *Id*. at 1864; *see* R. at 3280 (December 2011 VA examination report describing the straight leg-raising test and what constitutes a positive result).

In November 2008, Mr. Chavis filed a claim, asking VA to address the "[d]isability classification for [his] lower back injury," R. at 3508, which the RO construed as a claim for an increased evaluation for the lumbar spine disability, R. at 3463. Upon VA examination in December 2008, he reported constant pain across the low back that radiated into both lower legs. R. at 3474. He reported a current pain severity of 10/10 and noted that the pain was exacerbated with physical activity and relieved by rest, but that "sometimes [he] can only lie in bed until [the pain] goes away." *Id.* The examiner documented 20 degrees of lumbar flexion with pain at end range as well as limited mobility in other directions of movement. R. at 3475. The examiner additionally noted an antalgic gait and that, due to pain, Mr. Chavis used either a cane for ambulation or a wheelchair for locomotion. R. at 3474. The examiner diagnosed lumbar intervertebral disc syndrome (IVDS) of the sciatic nerve distribution and noted that Mr. Chavis presented with sensory deficits in the left lower leg and foot,[5] but noted normal reflexes and no motor weakness. R. at 3475. The examiner noted a positive straight leg-raising test bilaterally but no ankylosis. R. at 3474.

In a February 2009 decision, the RO increased the lumbar spine evaluation to 40% based on the December 2008 examiner's documentation of forward flexion limited to 30 degrees or less. R. at 3462-65; *see* 38 C.F.R. § 4.71a. In November 2009, Mr. Chavis filed a Notice of Disagreement (NOD), seeking to "[a]ppeal claims on past claim on back problems," R. at 3439-40, and, following a February 2010 Statement of the Case (SOC), R. at 3397-417, he perfected an appeal to the Board in April 2010, R. at 3394.

Upon VA examination in December 2011, Mr. Chavis reported constant low back pain that fluctuated in intensity "with no specific activity or movement" and resulted in "extreme" back pain, leg weakness, and an inability to bend forward. R. at 3277. The examiner documented 35 degrees of forward flexion with pain at end range, along with limited mobility in additional directions of movement, which did not change with repetitive testing. R. at 3277-79. During the examination, Mr. Chavis reported radicular pain, paresthesias, and decreased sensation in the left leg. R. at 3280-81. However, following examination, the examiner noted that Mr. Chavis presented with left-sided radiculitis secondary to the lumbar spine disability, not radiculopathy. R. at 3285; *see* R. at 3280

---

[5] Although unclear, it appears that the examination report contains a typographic error, as the examiner highlighted that sensory deficits in the *left* leg indicated a diagnosis of IVDS involving the *right* sciatic nerve. R. at 3475.

(recording a negative straight leg-raising test bilaterally), 3283-84 (referencing electromyography and nerve conduction testing results). The examiner noted that Mr. Chavis's decreased sensation in the left lower leg and foot was due to a 2006 left foot crush injury sustained at his work. R. at 3285; *see* R. at 3277 (noting that, following the 2006 injury, Mr. Chavis was treated with several casts and later developed complex regional pain syndrome (CRPS)).

In January 2012, Mr. Chavis sought treatment for chronic low back pain that radiated into the left anterior thigh. R. at 3268. At that time, he described "episodes" of pain that left him unable to move, which he indicated occurred about five times per year. *Id*. He stated that when he is not in an "episode," his pain level is at a 2/10, but when he is in an "episode," "his pain [is] a 50/10." R. at 3269. The treating healthcare clinician noted normal range of motion, albeit with decreased speed of movement. *Id*. The clinician concluded that Mr. Chavis was experiencing episodic discogenic pain. R. at 3270.

In June 2012, the RO issued a Supplemental SOC (SSOC). R. at 3129-33. As relevant, the RO indicated that the diagnosis of left lumbar radiculitis was added to Mr. Chavis's service-connected disability as part of the lumbar disorder and was not a separate diagnosis. R. at 3132. The RO stated that the December 2011 VA examiner "was clear that this diagnosis is based on subjective symptoms and does not constitute a separate diagnosis of radiculopathy." *Id*.

During a December 2015 Board hearing, Mr. Chavis testified about the episodic nature of his back and leg symptoms. Specifically, he described that, when he is experiencing a period of increased symptoms, he is unable to move and is either confined to his bed or dependent on a walker or wheelchair. R. at 3027-36. In describing the severity of several past episodes, he recounted one episode in 1997 where he was confined to his bed for 8 months, R. at 3028, 3031-32, and several other episodes that required calling for an ambulance to transport him out of bed and to the hospital for treatment, most recently in 2003 or 2004, R. at 3027-28, 3036. He also described radiating pain and numbness in his legs. R. at 3037, 3039-40.

In February 2016, the Board remanded the lumbar spine claim, in part, to obtain a VA examination addressing the severity of the lumbar spine disability as well as to determine the presence of neurologic manifestations. R. at 3011-15. Upon the subsequent VA examination in February 2017, the examiner documented 70 degrees of pain-free forward flexion with no change following repetitive testing. R. at 638. The examiner indicated that the examination was being conducted during a flare-up and that Mr. Chavis's functional ability was not significantly limited

4

by pain, weakness, fatigability, or incoordination. R. at 639. The examiner also noted no signs of radiculopathy, no ankylosis, and no IVDS. R. at 641-42. Following a review of conflicting medical evidence, the examiner indicated that the lower extremity functional impairment noted during the December 2011 examination was "only due to [the] left crush injury in 2006." R. at 648.

The examiner also indicated that Mr. Chavis demonstrated positive straight leg-raising testing bilaterally, but no radicular pain or other signs or symptoms of radiculopathy. R. at 641. Based on this apparent discrepancy, *see supra* n.4, the RO requested an addendum medical opinion. R. at 82. In the November 2017 addendum opinion, the examiner clarified that Mr. Chavis presented with symptoms of radiculopathy and specifically noted moderate numbness in both lower legs resulting in moderate bilateral radiculopathy. R. at 82-83. She further indicated that the bilateral radiculopathy was a progression of the previous diagnosis of low back strain with herniated nucleus pulposus at the L4-L5 spinal level. R. at 83-84.

In December 2017, the RO issued an SSOC continuing the denial of an evaluation higher than 40% for the lumbar spine disability. R. at 55-69. In January 2018, the RO awarded service connection for right and left lower extremity radiculopathy as associated with the lumbar spine disability and assigned an initial 10% evaluation for each leg. R. at 41-46, 50-54.[6]

In the April 2018 decision on appeal, the Board, as relevant, adjudicated three issues: (1) entitlement to an evaluation higher than 40% for the lumbar spine disability; (2) entitlement to an initial evaluation higher than 10% for left lower extremity radiculopathy associated with the lumbar spine disability; and (3) entitlement to an initial evaluation higher than 10% for right lower extremity radiculopathy associated with the lumbar spine disability.

With respect to the lumbar spine disability, the Board noted that Mr. Chavis could be evaluated under either the General Rating Formula or the Formula for Rating IVDS Based on Incapacitating Episodes (Incapacitating Episodes Formula), whichever resulted in a higher evaluation. R. at 6. After reviewing the evidence, the Board found that the criteria for an evaluation higher than 40% under either formula had not been met. R. at 10. The Board noted that, for a higher evaluation to be warranted, "there must be evidence of either ankylosis of the spine[] or IVDS treated by bed rest prescribed by a physician." *Id*. However, the Board found that "[n]either of these symptoms is present." *Id*. The Board explained that the evidence indicated that Mr. Chavis's

---

[6] Although this decision is dated in December 2017, R. at 50, the RO did not notify Mr. Chavis of its decision until January 2018, R. at 41. The Court will refer to it as a January 2018 decision.

lumbar spine disability did not manifest in ankylosis and, although he reported episodes of flare-ups of his back pain necessitating hospital treatment, none had occurred during the relevant appeal period and there was no evidence that he was prescribed bed rest by a physician. *Id.* The Board then "considered the provisions of [38 C.F.R. §§] 4.40 and 4.45," but found them not applicable because "the [v]eteran already has the highest available rating based on restriction of motion." R. at 10-11 (citing *Johnston v. Brown*, 10 Vet.App. 80, 85 (1997)).

The Board then found that it had jurisdiction over the appropriate evaluations for the radiculopathy disabilities because "ratings for bilateral radiculopathy are part and parcel of the claim for an increased rating for a lumbar spine disability." R. at 3. The Board noted that the radiculopathy disabilities were assigned initial 10% evaluations under 38 C.F.R. § 4.124a, Diagnostic Code (DC) 8520, which contemplates paralysis of the sciatic nerve, but increased those evaluations to 20% based on the November 2017 examiner's opinion that the radiculopathy disabilities were moderate in severity. R. at 11-12. The Board denied evaluations higher than 20% because the veteran's radiculopathy was not moderately severe. R. at 12. This appeal followed.

## II. LUMBAR SPINE DISABILITY

### A. Arguments

Mr. Chavis argues that the Board erred in relying on *Johnston* to determine that §§ 4.40 and 4.45 did not apply to his lumbar spine evaluation. Appellant's Brief (Br.) at 8; *see* R. at 10-11. He contends that the Court in *Johnston* found that the Board did not need to consider additional functional loss due to pain, not because the appellant was receiving the maximum evaluation based on limitation of motion, but because the appellant was receiving the maximum evaluation for the particular DC. Appellant's Br. at 8-9. He further argues that, because "[a]n ankylosed joint presents functional loss that manifests as complete limitation of motion," §§ 4.40 and 4.45 are for application within the General Rating Formula because of the availability of higher evaluations. *Id.* at 9. He additionally argues that the Board's failure to apply §§ 4.40 and 4.45 was prejudicial because his disability more nearly approximates the functional equivalent of unfavorable ankylosis. *Id.* at 10.

In response, the Secretary argues that the evidence of record, including the 2008, 2011, and 2017 VA examination reports, failed to demonstrate functional loss equivalent to a restriction of range of motion contemplated by unfavorable ankylosis. Secretary's Br. at 11-14; *see id.* at 14

6

("Each examiner determined that [Mr. Chavis's] spine was not fixed in flexion or extension, even when the examination was performed during a flare-up."). He additionally argues that the Board properly relied on *Johnston*, which he asserts "plainly held that the Board does not err in its denial of entitlement to an evaluation based on ankylosis, where ankylosis was not shown on multiple examinations." *Id*. at 16 (citing *Johnston*, 10 Vet.App. at 84).

At times in his brief, the Secretary appears to contend that, even if a claimant could satisfy the regulation by demonstrating the functional equivalent of ankylosis, the appellant here had not done so. *See, e.g.*, *id*. at 13 ("[Y]et no examination found ankylosis or the equivalent of fixation in flexion or extension."). However, at oral argument, he affirmatively took the position that the General Rating Formula does not contemplate the functional equivalent of ankylosis. Oral Argument at 39:36-40:46, 42:19-43:50, 47:20-49:08, 51:37-52:12 ("[N]o caselaw or regulation supports the finding of functional equivalency [of ankylosis.]"). He argued that, because of the distinction between limitation of motion and ankylosis (consolidation of the joint resulting in restriction of motion), the constructs of functional equivalency do not apply. *Id*. at 39:36-40:46, 47:20-49:08. In essence, the Secretary argues that, because ankylosis involves a restriction of motion or consolidation of the joint, a claimant cannot demonstrate the functional equivalent of ankylosis.

## B. Analysis

### 1. Ankylosis and VA's Schedule for Rating Disabilities

Ankylosis is a medical term meaning "[i]mmobility and consolidation of a joint due to disease, injury, or surgical procedure." DORLAND'S at 94; *see* STEADMAN'S MEDICAL DICTIONARY 95 (28th ed. 2006) ("Stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint."); CHURCHILL'S ILLUSTRATED MEDICAL DICTIONARY 91 (1989) ("A stiffening or immobilization of a joint as a result of injury, disease, or surgical intervention."). The word "ankylosis" has been part of the Rating Schedule since it was published in 1919, when it was titled "Schedule of Ratings for Amputations and Ankylosis." Although spine conditions were not included in the 1919 edition, they were included in the 1925 edition, at which time the Rating Schedule provided separate evaluations for "[a]nkylosis (complete fixation)" and for "[l]imitation of motion." *The Schedule for Rating Disabilities, Musculoskeletal System* (1925). The provision of separate evaluations for ankylosis and limitation of motion was maintained in the Rating Schedule until VA adopted the General Rating Formula in 2003. *See Schedule for Rating*

7

*Disabilities; The Spine*, 67 Fed. Reg. 56509, 56510 (Sept. 4, 2002) (proposed rule); *Schedule for Rating Disabilities; The Spine*, 68 Fed. Reg. 51454 (Aug. 27, 2003) (final rule).[7]

Spine disabilities other than IVDS are evaluated under the General Rating Formula. 38 C.F.R. § 4.71a, DCs 5235-5242.[8] With respect to disabilities involving the thoracolumbar spine, the General Rating Formula provides evaluations as follows:

100%: Unfavorable ankylosis of the entire spine

50%: Unfavorable ankylosis of the entire thoracolumbar spine

40%: Forward flexion of the thoracolumbar spine 30 degrees or less; OR, favorable ankylosis of the entire thoracolumbar spine

20%: Forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; OR, the combined range of motion of the thoracolumbar spine not greater than 120 degrees; OR, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis

10%: Forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees; OR, combined range of motion of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; OR, muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; OR, vertebral body fracture with loss of 50% or more of the height

38 C.F.R. § 4.71a. Under the General Rating Formula, an evaluation is based upon "orthopedic findings," including ankylosis, limitation of motion, muscle spasm, guarding, and tenderness. 67 Fed. Reg. at 56511.

In 2002, when VA proposed to implement the General Rating Formula, it noted that ankylosis had been defined by the then-current Rating Schedule as "bony fixation" but, while the Rating Schedule differentiated between favorable and unfavorable ankylosis, it did not define either term. *Id.* at 56510. Therefore, VA proposed to add the current Note (5) to define favorable

---

[7] Ankylosis is not limited to spinal joints, but can occur in any joint, as is reflected throughout various DCs within the Rating Schedule. *See* 38 C.F.R. § 4.71a, DC 5200 (shoulder), DC 5205 (elbow), DC 5214 (wrist), DCs 5216-5227 (digits of the hand), DC 5250 (hip), DC 5256 (knee), DC 5270 (ankle). Our analysis is limited to the General Rating Formula, and we take no position on the application of the principle of functional equivalence to other parts of the Rating Schedule.

[8] IVDS is evaluated under either the General Rating Formula or the Incapacitating Episodes Formula, whichever method is productive of a higher evaluation when all disabilities are combined under 38 C.F.R. § 4.25. 38 C.F.R. § 4.71a, DC 5243. Although the Board concluded that Mr. Chavis was not entitled to a higher evaluation under the Incapacitating Episodes Formula, Mr. Chavis does not argue that the Board erred in this portion of its analysis and the Court will not address it further. *See Grivois v. Brown*, 6 Vet.App. 136, 138 (1994) (explaining that the Court has discretion to deem unargued issues abandoned).

and unfavorable ankylosis, with unfavorable ankylosis being defined as a condition in which the entire spine or an entire spinal segment is fixed in flexion or extension and the ankylosis results in one or more associated complications. *Id*. at 56511; *see* 38 C.F.R. § 4.71a, General Rating Formula, Note (5).[9] In its proposed rule, VA noted that the presence of additional symptoms, "which may be indications for spinal surgery, represent disability greater than limitation of motion of the spine alone." 67 Fed. Reg. at 56511. In contrast, ankylosis is considered favorable if the fixation is in a neutral position (0 degrees) or does not result in an associated complication. *See* 38 C.F.R. § 4.71a, General Rating Formula, Note (5).

*2. Ankylosis is an objective finding.*

Despite the Secretary's assertion during oral argument that ankylosis is a diagnosis, *see* Oral Argument at 35:15-:45, 37:25-:35; *see also id*. at 43:50-45:01 (characterizing consolidation of the spine as a disease process),[10] it is worth reiterating that VA considers ankylosis to be an objective finding like limitation of motion, muscle spasm, guarding, and tenderness. 67 Fed. Reg. at 56510 ("We propose to delete the seven diagnostic codes . . . that involve findings of ankylosis or limitation of motion of the spine because, rather than representing conditions or diagnoses, they are findings that are common to a variety of spinal conditions."); *id.* at 56511 ("[W]e propose to evaluate all disabilities of the spine . . . using a general formula that will be based on the orthopedic findings such as limitation of motion, ankylosis, muscle spasm, guarding, and tenderness, present in the individual case."); *see* 38 C.F.R. § 4.71a, DC 5002 (describing ankylosis as a "residual[]" of rheumatoid arthritis), *VA Adjudication Procedures Manual* (M21-1) III.iv.4.A.2.n (defining ankylosis as "a condition of, or term used for the sign/symptom of, abnormal stiffness, immobility, or abnormal bending of a joint"), M21-1 III.iv.4.B.1.a-c (describing ankylosis as a possible "symptom" of rheumatoid arthritis), M21-1 III.iv.4.B.2.b-d (describing ankylosis as a possible "symptom" of degenerative arthritis); *see also* R. at 10 (Board's characterization of ankylosis as a "symptom").

---

[9] The Note defines the list of complications as follows: difficulty walking because of a limited line of vision; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure on the costal margin of the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching. 38 C.F.R. § 4.71a, General Rating Formula, Note (5).

[10] *But see* Oral Argument at 42:20-:35 (characterizing ankylosis as a "medical finding"); Secretary's Br. at 16-17 (characterizing unfavorable ankylosis as "the only symptom listed in DC 5237" warranting a 50% evaluation).

*3. Sections 4.40 and 4.45 apply when evaluating joint condition severity for the presence of the functional equivalence of ankylosis.*

The Rating Schedule provides prefatory regulations under the umbrella heading of "Musculoskeletal System" that are "intended to be used in understanding the nature of a veteran's disability." *Thompson v. McDonald*, 815 F.3d 781, 785 (Fed. Cir. 2016); *see Lyles v. Shulkin*, 29 Vet.App. 107, 117 (2017) (explaining that the prefatory regulations—including §§ 4.40 and 4.45—help "'explain how to arrive at proper evaluations'" for musculoskeletal disabilities (quoting *Petitti v. McDonald*, 27 Vet.App. 415, 424 (2015))). Although any individual evaluation must be "based on the criteria set forth in § 4.71a," *Thompson*, 815 F.3d at 786, a veteran may be entitled to "a higher musculoskeletal evaluation than would otherwise be supported by mechanical application of a given DC" when his or her disability is properly viewed through the lens of those leading regulations, *Lyles*, 29 Vet.App. at 117.

Specifically, a veteran may be entitled to a higher evaluation where there is evidence that his or her disability causes additional functional loss—i.e., "the inability . . . to perform the normal working movements of the body with normal excursion, strength, speed, coordination[,] and endurance"—including as due to pain. 38 C.F.R. § 4.40 (2020); *see Mitchell v. Shinseki*, 25 Vet.App. 32, 36-37 (2011); *DeLuca v. Brown*, 8 Vet.App. 202, 205-06 (1995). Additionally, a higher evaluation may also be awarded where there is a reduction of a joint's normal excursion of movement in different planes, including changes in the joint's range of movement, strength, fatigability, or coordination. 38 C.F.R. § 4.45 (2020); *see Mitchell*, 25 Vet.App. at 37; *DeLuca*, 8 Vet.App. at 206-07. "Elevation of a veteran's musculoskeletal disability under either of these methods, colloquially known as the *DeLuca* factors, is based on additional functional loss with use or during flare-ups, which should, if feasible, be portrayed in terms of the degree of additional range-of-motion lost." *Lyles*, 29 Vet.App. at 118 (citing *DeLuca*, 8 Vet.App. at 206).

Caselaw dictates that, when evaluating joint disabilities and their manifestations, adjudicators must consider §§ 4.40 and 4.45 to fully understand the nature of a veteran's disability. *See Thompson*, 815 F.3d at 785; *Lyles*, 29 Vet.App. at 117-18; *see also Petitti*, 27 Vet.App. at 424. And our caselaw makes clear that application of the *DeLuca* factors may result in a higher evaluation than one based solely on limited motion if a claimant demonstrates functional loss equivalent to that contemplated by the higher evaluation. *See Lyles*, 29 Vet.App. at 117-18; *DeLuca*, 8 Vet.App. at 206. Although in the past we have focused on application of the *DeLuca* factors in the context of limitation of motion, nothing in those regulations or our caselaw suggests

that those factors should not apply in the context of ankylosis, particularly as ankylosis is, in essence, a complete limitation of motion. *See* DORLAND'S at 94. This is consistent with VA's aim to "ensure that a claimant is properly compensated, but not overcompensated, for the actual level of impairment." *Lyles*, 29 Vet.App. at 118 (citing *Amberman v. Shinseki*, 570 F.3d 1377, 1380 (Fed. Cir. 2009)).

The provisions of §§ 4.40 and 4.45 are for application when evaluating joint disabilities and their manifestations, which may include ankylosis. Notably, § 4.45 directs adjudicators to identify certain considerations when evaluating joint disabilities, including whether the joint demonstrates less movement than normal. And it specifically identifies ankylosis among the possible causes of less movement. 38 C.F.R. § 4.45(a).[11] Section 4.40 directs adjudicators to consider the various ways functional loss manifests in musculoskeletal disabilities, including by interfering with the normal working movements of the body with normal excursion. Moreover, § 4.40 provides that "functional loss may be due to . . . pain, supported by adequate pathology and evidenced by the visible behavior of the claimant undertaking the motion." 38 C.F.R. § 4.40. Accordingly, application of §§ 4.40 and 4.45 permits consideration under the General Rating Formula of an evaluation based on ankylosis if a claimant's functional loss is consistent with that contemplated by ankylosis—in other words, if it is the functional equivalent of ankylosis. *Accord Johnson v. Brown*, 9 Vet.App. 7, 11 (1996) (concluding that §§ 4.40 and 4.45 apply to DCs that are "predicated on loss of range of motion").

Neither the Board nor the Secretary persuasively demonstrates that these regulations do not apply when contemplating joint ankylosis. The Board based its conclusion on the Court's decision in *Johnston*. R. at 10-11 (citing *Johnston*, 10 Vet.App. at 85). In *Johnston*, the appellant was in receipt of the maximal 10% evaluation under 38 C.F.R. § 4.71a, DC 5215, which contemplates limitation of motion of the wrist. *Johnston*, 10 Vet.App. at 84-85. The Board in that case considered application of an evaluation under DC 5214, which contemplates ankylosis of the wrist, but found no evidence of ankylosis, a finding the Court determined was not clearly erroneous. *Id*. at 84-85 (noting that a VA examiner documented good mobility and no pain on movement). On appeal, the appellant argued, and the Secretary agreed, that the Board failed to

---

[11] The Secretary acknowledges that § 4.45 mentions ankylosis, but argues that the regulation directs adjudicators to consider ankylosis only when a joint is ankylosed because, in his view, there can be no functional equivalent of ankylosis. Oral Argument at 39:36-40:46.

consider functional loss due to pain; however, the Court found that a remand was not appropriate because the appellant was already receiving the maximal evaluation under DC 5215. *Id.*

Here, the Board relied on *Johnston* as holding that §§ 4.40 and 4.45 are not for application when a claimant already has the highest available evaluation based on limitation of motion. R. at 11.[12] However, contrary to the Board's interpretation, *Johnston* does not stand for the proposition that the *DeLuca* factors are not applicable when a claimant is receiving the maximal evaluation based on limitation of motion. Instead, the Court in *Johnston* held that, when a claimant was receiving the maximal evaluation for a joint disability not manifesting in ankylosis under a particular DC, the Board's failure to consider functional loss under §§ 4.40 and 4.45 in evaluating the disability under that DC was harmless error. *Johnston*, 10 Vet.App. at 85; *see Spencer v. West*, 13 Vet.App. 376, 382 (2000) (also concluding that the Board's failure to consider §§ 4.40 and 4.45 in evaluating a wrist disability was harmless where the appellant was receiving the maximal evaluation under DC 5215 and there was no evidence of ankylosis).

In contrast to *Johnston* and *Spencer*, Mr. Chavis is not receiving the maximal evaluation available under DC 5237 via the General Rating Formula, and he is arguing that his spine disability results in the functional equivalent of ankylosis during flare-ups that render him unable to move. Therefore, the Board's reliance on *Johnston* to conclude that §§ 4.40 and 4.45 were not for application was incorrect.[13]

---

[12] The Board specifically referred to Mr. Chavis having the highest evaluation based on "restriction of motion," R. at 11; however, DC 5215—the operative DC in *Johnston*—instead uses the term "limitation of motion," 38 C.F.R. § 4.71a, DC 5215 (1996). To that end, the Secretary emphasized during oral argument that ankylosis is not just limitation of motion, but restriction of motion. Oral Argument at 40:16-:33. Because it is undisputed that Mr. Chavis is not receiving the highest evaluation available *for ankylosis* and because the Board did not discuss ankylosis in the same terms as argued by the Secretary, the Court assumes that the Board's use of "restriction of motion" was intended to be synonymous with "limitation of motion," which is consistent with its analysis. Of course, if the Board was using "restriction of motion" in the same manner as the Secretary—i.e., as synonymous with ankylosis—then the Board's statement would be a clear misstatement of the facts.

[13] In 1997, VA's Office of General Counsel arrived at a similar conclusion regarding *Johnston* vis-à-vis the applicability of §§ 4.40 and 4.45 in determining the proper evaluation for IVDS under DC 5293, the predecessor to DC 5243. VA Gen. Coun. Prec. 36-97 (Dec. 12, 1997) ¶¶ 4, 7. In that opinion, the General Counsel noted that the Court in *Johnston* found that a remand was inappropriate to consider entitlement to a higher evaluation because there was no evidence of ankylosis. *Id*. at ¶ 7. As a result, the General Counsel concluded that, even if a veteran was receiving an evaluation equivalent to the maximal evaluation based on limitation of motion of the spine, consideration of a higher evaluation would still be appropriate under DC 5293 if entitlement to the higher evaluation was supported by the evidence. *Id*.

The crux of the Secretary's argument against the application of the *DeLuca* factors is based on a distinction he makes between limitation of motion and restriction of motion; however, he fails to persuasively argue why such a distinction precludes application of §§ 4.40 and 4.45. The Secretary argues that VA has always considered ankylosis separate from limitation of motion, noting, as discussed above, that the Rating Schedule historically provided evaluations under separate DCs for limitation of motion of the spine versus ankylosis of the spine, a practice still employed today for other joints. Because of this dichotomy, he argues that ankylosis requires something more than limitation of motion. He further argues that, because ankylosis is consolidation of the joint, it is not amenable to assessment of functional equivalence.

Even accepting the Secretary's premise that ankylosis is distinct from limitation of motion and generally results in a greater level of functional impairment than that of limited motion,[14] such differences—which may be important considerations in determining whether a veteran's joint disability actually manifests in functional impairment equivalent to ankylosis—do not explain why §§ 4.40 and 4.45 should not apply when considering whether limitation of motion of a joint results in the functional equivalence of joint ankylosis consistent with the regulatory language and existing caselaw.

## C. Application

The Board's determination of the appropriate degree of disability is a finding of fact subject to the "clearly erroneous" standard of review. 38 U.S.C. § 7261(a)(4); *see Smallwood v. Brown*, 10 Vet.App. 93, 97 (1997). In reaching a decision, the Board is required to consider all evidence of record and to consider, and discuss in its decision, all "potentially applicable" provisions of law and regulation. *Schafrath v. Derwinski*, 1 Vet.App. 589, 593 (1991); *see* 38 U.S.C. § 7104(a); *Weaver v. Principi*, 14 Vet.App. 301, 302 (2001) (per curiam order). Whether a certain law or regulation was applicable to an undisputed set of facts is a question of law, which the Court reviews de novo. *Emerson v. McDonald*, 28 Vet.App. 200, 206 (2016).

The Court concludes that the Board committed an error of law when it determined that §§ 4.40 and 4.45 were not for application because Mr. Chavis was already receiving a 40% evaluation for his lumbar spine disability, the highest evaluation available based on limitation of motion. Therefore, the Board incorrectly foreclosed application of §§ 4.40 and 4.45 in evaluating

---

[14] In this regard, the Court recognizes that the Rating Schedule generally provides higher evaluations for joint ankylosis than joint limitation of motion.

Mr. Chavis's lumbar spine disability. Accordingly, the Court concludes that remand of the lumbar spine claim is warranted for readjudication. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is the appropriate remedy "where the Board has incorrectly applied the law").

Mr. Chavis additionally argues that the VA examinations upon which the Board relied contained insufficient information regarding the extent of his functional loss due to flare-ups. Appellant's Br. at 16-20. The adequacy of a medical examination or opinion is a question of fact, which the Court reviews for clear error. *See* 38 U.S.C. § 7261(a)(4); *see D'Aries v. Peake*, 22 Vet.App. 97, 104 (2008) (per curiam). The Board did not discuss the adequacy of the examinations in its April 2018 decision, *see* R. at 2-15, and the Court may not decide that factual matter in the first instance, *see Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) ("[A]ppellate tribunals are not appropriate fora for initial fact finding.").

Nevertheless, the Secretary argues that the Board was not obligated to discuss the adequacy of the examination reports because those reports appear adequate on their face. Oral Argument at 53:18-55:39.[15] To the extent that he argues that the Board made an implicit finding that the examination reports were adequate, any such implicit finding would be in part predicated on the erroneous legal conclusion that §§ 4.40 and 4.45 and considerations of functional loss during flare-ups did not apply. Because we have determined that the Board's legal conclusion about functional loss was incorrect, we cannot properly review any implicit determination regarding the adequacy of the examinations. *See D'Aries*, 22 Vet.App. at 104. Mr. Chavis is free to raise those arguments regarding the adequacy of the examinations to the Board upon readjudication.

### III. RADICULOPATHY DISABILITIES[16]

#### A. Arguments

In his briefs, Mr. Chavis argued that the Board erred in denying higher evaluations for the radiculopathy disabilities when it adopted the assessment of the November 2017 VA examiner without articulating the standards it used to assign the 20% evaluations. Appellant's Br. at 20-25. He argues that the Board's failure to articulate the standard it used to conclude that his disability was moderate in severity—as opposed to moderately severe, the next higher level of severity in

---

[15] To that end, Mr. Chavis argues that, at a minimum, the February 2017 examination report is patently unreliable. Oral Argument at 10:30-13:13 (discussing alleged inconsistencies of the three examination reports).

[16] Judge Meredith does not join in this part of the Court's opinion.

the Rating Schedule—renders its decision arbitrary and capricious. *Id*. at 23-24 (citing *Johnson v. Wilkie*, 30 Vet.App. 245, 255 (2018)). The Secretary conceded that remand of the issue of appropriate radiculopathy evaluations was warranted, agreeing that "the Board failed to disclose the standard that it used to render its determination" that evaluations higher than 20% were not warranted. Secretary's Br. at 18 (citing *Johnson*, 30 Vet.App. at 255).

Although the merits of the radiculopathy evaluations were not discussed at oral argument, the Court asked the parties to address the Board's jurisdiction, and by extension the Court's jurisdiction, to review the Board's decision regarding the appropriate radiculopathy evaluations. Both parties agreed that the Board had jurisdiction over the radiculopathy evaluations. Oral Argument at 31:06-32:33, 55:40-56:58. Additionally, the Secretary reaffirmed his position that the issue of the appropriate evaluations should be remanded in light of the Board's inadequate reasons or bases. Oral Argument at 55:40-56:58.

However, on January 16, 2020, the Secretary filed a "Notice of Clarification to the Court," clarifying that, although he was not challenging the Board's award of increased 20% evaluations for the radiculopathy disabilities, "the Board technically did not have jurisdiction" over those matters because Mr. Chavis did not file an NOD following the January 2018 RO decision that awarded service connection and assigned the initial 10% evaluations for bilateral radiculopathy. Following the Secretary's clarification, the Court, on April 30, 2020, ordered the parties to file supplemental memoranda of law addressing the Board's jurisdiction to adjudicate increased evaluations for the radiculopathy disabilities.

Mr. Chavis argues that the Board properly had jurisdiction over the radiculopathy evaluations because those matters were part of the claim for an increased evaluation for the lumbar spine disability. Appellant's Supplemental Memorandum of Law (Supp. Memo.) at 2-11 (citing *Harper v. Wilkie*, 30 Vet.App. 356, 361-62 (2018)). In so arguing, he relies on the plain language of Note (1) of the General Rating Formula, the M21-1, and Board decisions assuming jurisdiction in the same manner as the Board did in Mr. Chavis's case. *Id*. at 2-9. Alternatively, he argues that his November 2009 NOD as to the lumbar spine evaluation placed the radiculopathy evaluations in appellate status because it expressed disagreement with the February 2009 RO decision that did not address neurologic complications. *Id*. at 10-11.

In contrast, the Secretary argues that the Board erroneously determined that it had jurisdiction over the radiculopathy evaluations because Mr. Chavis did not file an NOD following

the January 2018 RO decision granting service connection and assigning the initial evaluations. Secretary's Supp. Memo. at 3-14. He further argues that, although Note (1) of the General Rating Formula provides that neurologic abnormalities associated with a spine disability are to be evaluated separately, neither the clear language of Note (1) nor the history or purpose of the Note eliminates the requirement that a claimant must file an NOD regarding the propriety of those separate evaluations. *Id.* at 6-8. He additionally argues that, unlike the part-and-parcel nature of TDIU as analyzed in *Harper*, the propriety of the evaluations for neurologic abnormalities associated with spine disabilities is a downstream issue requiring a separate NOD. *Id.* at 12-14.

B. The Board had jurisdiction over the radiculopathy evaluations.

Every "statutory tribunal must ensure that it has jurisdiction over each case *before* adjudicating the merits"; to that end, "a potential jurisdictional defect may be raised by the court or tribunal, *sua sponte* or by any party, at any stage in the proceedings, and, once apparent, must be adjudicated." *Barnett v. Brown*, 83 F.3d 1380, 1383 (Fed. Cir. 1996); *see Smith v. Brown*, 10 Vet.App. 330, 332 (1997). "Accordingly, the Court always has jurisdiction to determine its jurisdiction over a case." *Smith*, 10 Vet.App. at 332.

The Court concludes that, given the nature and progression of Mr. Chavis's lumbar spine condition and VA's duty to sympathetically construe his broadly worded, pro se filings, the issues of increased evaluations for Mr. Chavis's bilateral lower extremity radiculopathy were part of his claim seeking a higher evaluation for the underlying lumbar spine disability.[17]

First, the lay and medical evidence throughout the appeal period of the lumbar spine claim reflects neurologic signs and symptoms that have now been attributed to the bilateral lower extremity radiculopathy. During the December 2008 VA examination, Mr. Chavis reported radiating pain into both legs, and the examiner documented a positive straight leg-raising test bilaterally and sensory deficits in the left lower leg and foot. R. at 3474-75. In April 2011, Mr. Chavis reported radiating pain into his left thigh, and his treating VA physician documented a positive straight leg-raising test and decreased sensation in the left leg. R. at 3330-33. During the December 2011 VA examination, Mr. Chavis reported left-sided radiating pain, paresthesias, and sensory deficits. R. at 3280-81. In January 2012, he reported radiating pain into his left thigh, and his treating physician noted absent patellar reflexes and left foot weakness and decreased

---

[17] We leave for another day the question whether issues of higher evaluations for radiculopathy are always part of claims seeking higher evaluations for the underlying spine disability.

sensation. R. at 3268-69. And in the November 2017 addendum medical opinion, the VA examiner noted bilateral lower extremity numbness. R. at 82-83.

Although medical professionals have ascribed these neurologic signs and symptoms to differing diagnoses throughout the appeal period, *see* R. at 3475 (December 2008 VA examiner diagnosing IVDS affecting the sciatic nerve), 3333-34 (April 2011 VA physician noting both CRPS following foot trauma and lumbosacral radiculopathy), 3285 (December 2011 VA examiner documenting IVDS and diagnosing radicular pain as left-sided radiculitis but ascribing the sensory deficits to the 2006 crush injury), 3269 (January 2012 VA physician diagnosing discogenic pain but ascribing the left lower leg deficits to CRPS), 82-83 (November 2017 VA examiner diagnosing bilateral lower extremity radiculopathy); *see also* R. at 3589-90 (January 1999 RO decision noting that March 1998 MRI results were questionable for left lumbar radiculopathy), VA now considers these symptoms demonstrative of bilateral lower extremity radiculopathy and has evaluated those symptoms under the DC contemplating involvement of the sciatic nerve, R. at 11-12, 50-52. Moreover, the November 2017 examiner specifically stated that the radiculopathy was a progression of the service-connected lumbar spine disability and not a new and separate condition. R. at 83-84. In sum, the lay and medical evidence presented and developed in connection with the lumbar spine claim indicates that Mr. Chavis's radiculopathy is part of his lumbar spine disability.

Second, VA has considered Mr. Chavis's reports of neurologic sequelae as part of his claim seeking increased compensation for his back disability. In the June 2012 SSOC, the RO noted that, although the December 2011 VA examiner did not diagnose radiculopathy, he diagnosed radiculitis as accounting for Mr. Chavis's radicular pain. R. at 3132. Accordingly, the RO "added left lumbar radiculitis to [his] diagnoses as part of the disease process of [his] service[-]connected disability." *Id*. Following discussion of neurologic symptoms and the availability of separate evaluations during the December 2015 Board hearing, *see* R. at 3036-40, the Board remanded the lumbar spine claim in February 2016, in part, to afford Mr. Chavis a new VA examination, R. at 3011-15. As relevant, the Board specifically directed the VA examiner to identify all neurologic manifestations of the service-connected back condition and to render an opinion regarding the severity of any identified manifestations. R. at 3014.

The Board's and the RO's consideration of Mr. Chavis's lumbar spine disability as including neurologic manifestations is consistent with provisions of VA's *Adjudication Procedures Manual* that discuss the interrelated nature of orthopedic and neurologic manifestations of spine

disabilities. Specifically, the M21-1 details that, when using the General Rating Formula, adjudicators are to "evaluate conditions based on chronic orthopedic manifestations . . . and any associated neurological manifestations . . . by assigning separate evaluations for the orthopedic and neurological manifestations." M21-1, III.iv.4.A.5.a; *see* 38 C.F.R. § 4.71a, General Rating Formula, Note (1).[18] And the M21-1 instructs adjudicators that, "[b]ecause spinal disease can cause objective neurologic abnormalities, the onset of a neurologic complication represents medical progression or worsening of the spinal disease" and to treat a claim asserting a new neurologic complication as a claim for increase of the underlying spine disease. M21-1, III.iv.4.A.5.d.

VA's consideration of Mr. Chavis's neurologic manifestations as part of the claim seeking higher compensation for the lumbar spine disability is also consistent with VA's duty to sympathetically read pro se pleadings. *See Roberson v. Principi*, 251 F.3d 1378, 1384 (Fed. Cir. 2001) ("Congress has mandated that the VA is 'to fully and sympathetically develop the veteran's claim to its optimum.'" (quoting *Hodge v. West*, 155 F.3d 1356, 1362 (Fed. Cir. 1998))). Given that there was evidence of neurologic manifestations contemporaneous with Mr. Chavis's pleadings and that those pleadings were broadly worded, *see* R. at 3508 (November 2008 informal claim), 3440 (November 2009 NOD), a sympathetic reading of those readings compels a conclusion that they encompassed the appropriate evaluations for the neurologic component of Mr. Chavis's lumbar spine disability. *See Maggitt v. West*, 202 F.3d 1370, 1375 (Fed. Cir. 2000) (noting that a "broad NOD . . . may confer jurisdiction over the entire request for a benefits entitlement"). Although clarity may not have been obtained until VA confirmed the source of the neurologic manifestations, such hindsight does not change VA's duties to consider the "general lenity rule" in determining the scope of the claim based on the claimant's filings and evidence of record. *See Murphy v. Wilkie*, 983 F.3d 1313, 1319 (Fed. Cir. 2020).

Therefore, the Court concludes that the Board properly had jurisdiction over the issues of increased evaluations for bilateral lower extremity radiculopathy. Because Mr. Chavis's radiculopathy was part of his claim seeking higher compensation for his lumbar spine disability, the Board did not err, in this particular case, by choosing to address the appropriate evaluation for the radiculopathy component of Mr. Chavis's lumbar spine condition. *See Bernard v. Brown*,

---

[18] Similarly, the M21-1 instructs adjudicators that, when evaluating spinal conditions under the Incapacitating Episodes Formula, separate evaluations for associated neurologic manifestations are not warranted because evaluating IVDS based on incapacitating episodes already contemplates neurologic manifestations. M21-1, III.iv.4.A.5.a, e.

4 Vet.App. 384, 392 (1993) (holding that, where the Board properly had appellate jurisdiction to review a claim for benefits, "it follows that the Board was authorized to decide all questions presented on the record before it that were necessary to its decision on that matter"); *see also Godfrey v. Brown*, 7 Vet.App. 398, 409-10 (holding that *Bernard* applies where the questions are components of a single claim for benefits and characterizing Mr. Godfrey's claim for service connection for an ankle disability as a separate matter because it "was not a component of the back-condition" claim).

C. Merits of the Board's Determination Regarding Increased Evaluations for Radiculopathy

Having explained that the Board had—and, by extension, that this Court has—jurisdiction to address the proper evaluation for the bilateral lower extremity radiculopathy, we now move to the merits of the Board's decision on these issues. Mr. Chavis's bilateral lower extremity radiculopathy is currently evaluated under DC 8520. *See* R. at 11-12, *see also* 38 C.F.R. § 4.124a (2020). Under that DC, a 10% evaluation is warranted for mild incomplete paralysis; a 20% evaluation is warranted for moderate incomplete paralysis; a 40% evaluation is warranted for moderately severe incomplete paralysis; a 60% evaluation is warranted for severe paralysis, with marked muscular atrophy; and an 80% evaluation is warranted for complete paralysis. *Id*., DC 8520.

In its decision, the Board found that the criteria for a 20% evaluation, but no higher, were met and awarded an increased evaluation for both legs. R. at 11-12. In reaching its determination, the Board discussed the November 2017 VA examiner's opinion that the radiculopathy was moderate in severity, R. at 11, then concluded that the evidence demonstrated that the radiculopathy was moderate, R. at 12. The Board denied higher evaluations because the next higher level of severity—moderately severe—was not present at any time during the appeal period. *Id*.

As mentioned above, both parties agree that the Board failed to adequately explain its determination that evaluations higher than 20% were not warranted. Appellant's Br. at 20-25; Secretary's Br. at 18; *see* Secretary's Supp. Memo. at 16-17 (maintaining that, if the Court found that the Board properly had jurisdiction, the Board's decision regarding the radiculopathy evaluations should be set aside and remanded for inadequate reasons or bases).

The Court agrees. Notably, the Board failed to define the subjective terms contained in DC 8520. Without established benchmarks for those subjective terms, the Court is left without standards upon which to review the Board's decision. *See Johnson*, 30 Vet.App. at 255 ("Without

a standard for comparing and assessing terms of degree, such conclusory findings are unreviewable in this Court."); *see also Buczynski v. Shinseki*, 24 Vet.App. 221, 224 (2011) ("The Board must explain, in the context of the facts presented, the rating criteria used in determining the category into which a claimant's symptoms fall; it is not sufficient to simply state that a claimant's degree of impairment lies at a certain level without providing an adequate explanation.").

VA's *Adjudication Procedures Manual* provides benchmarks for mild, moderate, moderately severe, and severe peripheral nerve conditions, *see* M21-1, III.iv.4.N.4.c, but the Board did not discuss them. *See* Secretary's Br. at 18 (acknowledging the relevant M21-1 provision). Although the Board is not bound by the M21-1, the standards provided in the M21-1 are "relevant guidance promulgated for the purpose of facilitating the efficient and proper resolution of claims," which the Board must consider and address as part of its duty to provide a reasoned explanation for its decision. *Healey v. McDonough*, No. 18-6970, 2021 WL 710847, *5-6 (Vet. App. Feb. 24, 2021); *see Overton v. Wilkie*, 30 Vet.App. 257, 264 (2018). Instead, the Board simply relied on the November 2017 examiner's assessment that Mr. Chavis's radiculopathy was moderate in severity, R. at 11-12; however, "the Board cannot uncritically adopt an examiner's assessment of the veteran's level of disability as its own without reconciling that assessment with the other evidence of record," *Delrio v. Wilkie*, 32 Vet.App. 232, 243 (2019) (citing *Gabrielson v. Brown*, 7 Vet.App. 36, 40 (1994) (noting that a medical opinion is "only that, an opinion" providing medical evidence)).

As the Board failed to provide context for subjective terms contained in the DC, the Court agrees with the parties and concludes that the Board failed to provide adequate reasons or bases for its decision. *See Caluza*, 7 Vet.App. at 506. The Board's failure in this respect prevents Mr. Chavis from understanding the precise basis for its finding and frustrates judicial review. *See* 38 U.S.C. § 7104(d)(1); *Allday*, 7 Vet.App. at 527; *Gilbert*, 1 Vet.App. at 56-57. Remand of these issues is therefore warranted. *See Tucker*, 11 Vet.App. at 374 (holding that remand is warranted "where the Board has . . . failed to provide an adequate statement of reasons or bases for its determinations").

On remand, Mr. Chavis is free to submit, and the Board must consider, additional arguments and evidence, including the arguments raised in his briefs to this Court. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002); *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order). The Court reminds the Board that "[a] remand is meant to entail a critical

examination of the justification for the [Board's] decision," *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and must be performed in an expeditious manner in accordance with 38 U.S.C. § 7112.

## IV. CONCLUSION

After consideration of the parties' briefs and supplemental memoranda, oral arguments, the record on appeal, and the governing law, those portions of the April 20, 2018, Board decision that denied entitlement to an evaluation higher than 40% for a lumbar spine disability and denied entitlement to evaluations higher than 20% for bilateral lower extremity radiculopathy are SET ASIDE, and those matters are REMANDED for readjudication consistent with this decision.

MEREDITH, *Judge*, concurring in part, dissenting in part: I join the opinion except for Part III, in which the majority concludes that the Board of Veterans' Appeals (Board) had, and this Court in turn has, jurisdiction over the appropriate disability rating for bilateral radiculopathy. Because the statutory framework and controlling caselaw require a Notice of Disagreement (NOD) in order to place a matter into appellate status, it is my view that the Board erred in assuming jurisdiction over that unappealed, downstream issue. As explained below, this jurisdictional requirement was not satisfied by an NOD predating the award of secondary service connection for radiculopathy, the need to file an NOD was not obviated by Note 1 to the General Rating Formula for Diseases and Injuries of the Spine (General Rating Formula), and the Board did not acquire jurisdiction under theories that the issue was reasonably raised or part and parcel of an increased rating claim.[19] I thus respectfully dissent from the majority's decision to remand this matter.

## I. Background

Here, it is undisputed that the appellant filed a claim for an increased disability rating for his service-connected lumbar spine condition in November 2008. Record (R.) at 3508. A VA regional office (RO) in February 2009 increased his disability rating from 20% to 40%, R. at 3462-65, and he filed an NOD in November 2009 disputing the assigned rating for his low back

---

[19] To be clear, I agree that VA had an obligation to adjudicate entitlement to benefits for the appellant's neurological conditions associated with his lumbar spine condition. *See Roberson v. Principi*, 251 F.3d 1378, 1384 (Fed. Cir. 2001); *Bailey v. Wilkie*, 33 Vet.App. 188, 203 (2021). Where I differ from the majority is that I find no legal basis to conclude that any matters addressed in that adjudication are automatically placed in appellate status without an NOD addressing that decision.

condition, R. at 3439-40. After the RO continued the 40% rating in a Statement of the Case (SOC), R. at 3397-417, the appellant perfected an appeal to the Board, R. at 3394. In February 2016, the Board remanded the matter for further development, including an examination to "record the [appellant's] reported symptoms of his lumbar spine disability" and "identify all neurological manifestations of the . . . back disability." R. at 3014.

Following the requested examination, the RO in December 2017 issued (1) a Supplemental SOC in which it continued the 40% rating for a low back strain, R. at 57-69; *see* R. at 53; and (2) a rating decision in which it awarded service connection for bilateral lower extremity radiculopathy "as related to the service-connected disability of low back strain" and assigned a 10% rating for each extremity, R. at 51. In the January 2018 cover letter to the rating decision, the RO advised the appellant that a Supplemental SOC "ha[d] been sent under separate cover," R. at 42, and that, if he did not agree with the rating decision, he must "complete and return . . . the enclosed" NOD form, R. at 44. Although the appellant did not submit an NOD in response, the Board in the April 2018 decision on appeal found that "the [appellant's] ratings for bilateral radiculopathy are part and parcel of the claim for an increased rating for a lumbar spine disability" and thus "[took] jurisdiction of such claims." R. at 3.

## II. November 2009 Notice of Disagreement

At the time the appellant filed his NOD with the February 2009 RO decision that granted benefits for a lumbar spine disability, applicable law provided that "[a]ppellate review will be initiated by a[n NOD] and completed by a substantive appeal after a[n SOC] is furnished." 38 U.S.C. § 7105(a) (2009).[20] "[A]n NOD relates to a specific 'adjudicative determination' on a specific date." *Ledford v. West*, 136 F.3d 776, 779 (Fed. Cir. 1998). "Just as the Court's jurisdiction is dependent on a jurisdiction-conferring NOD, the Board's jurisdiction, too, derives from a claimant's NOD." *Buckley v. West*, 12 Vet.App. 76, 82 (1998); *see Brannon v. West*, 12 Vet.App. 32, 34-35 (1998).

Here, the appellant does not contend that he filed an NOD as to the January 2018 RO decision awarding secondary service connection and 10% disability ratings for radiculopathy.

---

[20] As a result of the Veterans Appeals Improvement and Modernization Act of 2017, Pub. L. No. 115-55, § 2(q), 131 Stat. 1105, 1111 (Aug. 23, 2017), this section now provides: "Appellate review shall be initiated by the filing of a notice of disagreement in the form prescribed by the Secretary." 38 U.S.C. § 7105(a) (2021).

Rather, he avers that his November 2009 NOD encompassed disagreement with the RO's failure to adjudicate entitlement to benefits for radiculopathy in February 2009, and thus the Board had jurisdiction over the radiculopathy ratings in the decision on appeal. *See* Appellant's Supplemental Memorandum (Supp. Memo.) of Law at 10-11. Although I agree that the 2009 NOD could encompass disagreement with the RO's failure to *award* secondary service connection for radiculopathy in February 2009, it could not have placed into appellate status the *downstream* issue of the proper rating for radiculopathy—and thereby conferred on the Board jurisdiction over that issue—because the RO did not consider the *upstream* issue of entitlement to benefits for radiculopathy until January 2018, more than 8 years after the NOD was filed. *See Grantham v. Brown*, 114 F.3d 1156, 1158-59 (Fed. Cir. 1997) ("Because the first appeal concerned the rejection of the logically up-stream element of service-connectedness, the appeal could not concern the logically down-stream element of compensation level."); *see also Ephraim v. Brown*, 82 F.3d 399, 401 (Fed. Cir. 1996) ("[A] newly diagnosed disorder, whether or not medically related to a previously diagnosed disorder, can not be the same claim when it has not been previously considered."). In other words, in November 2009, there was no adjudicative determination as to the *disability ratings* for radiculopathy with which the appellant could have disagreed.

### III. General Rating Formula Note 1

In the alternative, the appellant contends that he did not need to file another NOD because VA, by regulation, has made the appropriate rating for associated neurologic abnormalities part of the underlying spine claim. In that regard, the parties agree that the language of Note (1) of the General Rating Formula is clear that, when the evidence establishes that a neurological complication is associated with a service-connected spine disability, that complication is to be service connected not as part of the underlying spine disability, but separately, based on the criteria in the Rating Schedule relevant to the particular neurological abnormality. *See* 38 C.F.R. § 4.71a, General Rating Formula, Note 1; *Schedule for Rating Disabilities; The Spine*, 67 Fed. Reg. 56,509, 56,510 (Sept. 4, 2002) (noting that "sensory or motor loss in [the] extremities are among the neurologic impairments that most commonly result from disease or injury of the spine"); VA ADJUDICATION PROCEDURES MANUAL, M-21, Pt. III, subpt. iv, ch. 4, § A.5.d ("Because spinal disease can cause objective neurological abnormalities, onset of a neurological complication represents medical progression or worsening of the spinal disease."); *see also* Appellant's Supp.

Memo. at 4; Secretary's Supp. Memo. at 6. In other words, there is no dispute that when VA considers benefits for a spinal disability, it must also consider whether there are any associated neurological complications and, if so, it must rate those complications separately.

Although the majority focuses on the effect of Note 1 in terms of the scope of the initial claim, the question before the Court is whether—where VA grants benefits for an associated neurological complication *after* the claimant has already filed an NOD as to a decision on an increased rating for the underlying spine disability—the issue of the proper rating for the associated neurological complication becomes part of the pending appeal of the rating assigned for the underlying back condition simply by virtue of the already-filed NOD. Note 1 does not resolve this question because it does not address appellate procedure or indicate whether disputes concerning a separate *grant of benefits* for associated neurological abnormalities may be placed into appellate status absent an NOD that *postdates* the grant. Thus, there is no basis for concluding that Note 1 obviates the statutory requirement for placing an issue into appellate status: "Appellate review will be initiated by a[n NOD] and completed by a substantive appeal after a[n SOC] is furnished." 38 U.S.C. § 7105(a) (2009).

## IV. Reasonably Raised Claims

The appellant further avers that, based on 38 C.F.R. § 3.155(d)(2) and VA's practice of adjudicating reasonably raised claims, the radiculopathy ratings were part of the low back claim that was before the Board. Appellant's Supp. Memo. at 6. And, in January 2021, he submitted supplemental authority pursuant to Rule 30(b) of the Court's Rules of Practice and Procedure in which he identified the Court's recent decision in *Bailey*, 33 Vet.App. at 188, as "relevant to [his] argument . . . that the issue of entitlement to ratings for neurological impairments caused by the back disability were part of his claim for the appropriate evaluation for the primary back disability." Appellant's Supp. Authority at 2.

In *Bailey*, relating to reasonably raised claims for secondary service connection, the Court held that "the text, history, and purpose of [38 C.F.R.] §§ 3.155(d)(2) and 3.160 indicate that VA is required to develop and adjudicate related claims for secondary service connection for disabilities that are reasonably raised during the adjudication of a formally initiated claim for the proper evaluation for the primary service-connected disability." 33 Vet.App. at 203. The Court determined that a claimant "need not file a separate, formal claim for secondary service

24

connection" for the reasonably raised disability, *id.* at 191, and that the RO decision on the secondary disability in that case, issued while the appeal of the primary disability was pending, "could not and did not divest the Board of jurisdiction over the veteran's initial appeal," *id.* at 204.

The Court in *Bailey* relied on *Warren v. McDonald*, in which there were two claim streams that resulted from VA's erroneous conclusion that the appellant had withdrawn his appeal of his claim for service connection for sleep apnea, originally denied in April 2009. 28 Vet.App. 214, 219 (2016). After VA made that erroneous conclusion, it construed a 2010 filing by the appellant as a request to reopen his claim; the RO granted the request and awarded secondary service connection for sleep apnea with an effective date in May 2010, and the appellant did not appeal. *Id.* at 216. When the matter reached the Board in the first claim stream, the Board stated that the appeal stemmed from the April 2009 RO decision but characterized the matter on appeal as the proper effective date for the award of service connection for sleep apnea. *Id.* at 217. The Court agreed with the appellant that the Board had mischaracterized the issue and that the matter before the Board was the appeal of the April 2009 denial of service connection for sleep apnea. *Id.* at 220. Notably, the Court explained that no appeal of the assigned effective date for secondary service connection had been addressed at the RO level—that is, the RO had not issued an SOC in response to an NOD as to that matter—and therefore the Board lacked jurisdiction over it. *Id.* at 221 (citing *Jarrell v. Nicholson*, 20 Vet.App. 326, 330-32 (2006) (en banc)). The Court remanded the appeal for the Board to "address the merits of the December 2008 claim." *Id.* at 221-22.

There were also two claim streams in *Bailey*: An appeal of a December 2015 rating reduction for service-connected prostate cancer and a January 2019 claim for benefits for lymphedema secondary to prostate cancer. 33 Vet.App. at 191-92. The Board, in March 2019, determined that the rating reduction was proper and that the appellant's claimed lymphedema and other prostate cancer residuals were not contemplated by the rating schedule for prostate cancer, which the Board found contemplated only voiding dysfunction. *Id.* at 192. While the appeal of the March 2019 Board decision was pending before this Court, the RO in July 2019 granted service connection for right and left lower extremity lymphedema secondary to prostate cancer residuals, with an effective date as of the date of the 2019 claim. *Id.* On appeal, the appellant argued that the Board should have considered secondary service connection for his reasonably raised prostate cancer residuals. *Id.* at 197. The Court rejected the Secretary's argument that those residuals were

25

not part of the claim stream related to the proper disability rating for prostate cancer because the appellant had not filed formal claims for those conditions. *Id.* at 204.

The Court's decision was based on a VA regulation that requires the Agency to "adjudicate entitlement to benefits for the claimed condition as well as entitlement to any additional benefits for complications of the claimed condition." 38 C.F.R. § 3.155(d)(2) (2020); *see Bailey*, 33 Vet.App. at 200. Because the appellant's claimed residuals were reasonably raised by the record during the pendency of the appeal of the proper rating for prostate cancer and no formal application was required, the Court held that VA was "required . . . to recognize, develop, and *adjudicate his entitlement to* secondary service connection" for complications of prostate cancer and that the Board thus erred in failing to address those issues. *Bailey*, 33 Vet.App. at 203 (emphasis added). The Court further concluded that the RO's subsequent grant of secondary service connection and assignment of an effective date and disability rating for those residuals in the separate claim stream "could not and did not divest the Board of jurisdiction" over the initial appeal. *Id*. at 204. Accordingly, the Court remanded "[t]he reasonably raised claims for secondary service connection . . . for further development . . . and adjudication," which would "preserve[] the possibility of an earlier effective date" for the award of secondary service connection. *Id.* at 204-05.

On the other hand, the case now before the Court involves only a single claim stream: A request for an increased rating for a service-connected lumbar spine disability. In the course of the development and adjudication of that claim, associated neurological complications were documented (i.e., were reasonably raised) and, in accordance with Note 1, rated as separate, secondary disabilities under the appropriate diagnostic code. In other words, VA complied with *Bailey*, as well as with the requirements of Note 1, by addressing entitlement to secondary service connection for the reasonably raised complications of the appellant's lumbar spine condition.

Nothing in *Warren* or *Bailey* addresses what is necessary to place into appellate status downstream elements once VA adjudicates a reasonably raised claim. Nor do those cases require VA to necessarily construe an appeal related to the primary condition as including an appeal with respect to the rating assigned for the secondary condition, particularly where benefits for the secondary condition are granted in a separate decision to which the claimant does not file an

NOD.[21] To the contrary, *Warren* explicitly concluded that the Board lacked jurisdiction over a downstream element—the effective date for service connection—not addressed by the RO in the same claim stream, and *Bailey* at least implicitly found that the rating and effective date for the secondarily service-connected condition were not before the Board in its review of the proper evaluation of the primary condition. *See Bailey*, 33 Vet.App. at 204; *Warren*, 28 Vet.App. at 221. As a result, these cases do not compel or support the conclusion that the Board here had jurisdiction over the downstream element of disability ratings for the secondarily service-connected condition.

## V. Part and Parcel

The appellant also likens the procedural posture of his case to that of a matter involving a total disability rating based on individual unemployability (TDIU), which the Court has held is part and parcel of the underlying claim for benefits or for an increased rating and therefore need not be appealed separately from the adjudication on the underlying condition(s). Appellant's Supp. Memo. at 2-3, 7 (citing *Comer v. Peake*, 552 F.3d 1362, 1367 (Fed. Cir. 2009); *Harper v. Wilkie*, 30 Vet.App. 356, 361 (2018); *Rice v. Shinseki*, 22 Vet.App. 447, 453 (2009) (per curiam)). He argues that he, like a claimant seeking TDIU, is simply seeking an appropriate evaluation for the overall level of disability related to his spine. *Id.* at 7. However, "a request for TDIU . . . is not a separate claim for benefits, but rather involves an attempt to obtain an appropriate rating for a disability or disabilities." *Rice*, 22 Vet.App. at 453; *see Comer*, 552 F.3d at 1367; *Harper*, 30 Vet.App. at 359. In other words, TDIU is another avenue through which a claimant may obtain a 100% rating for a service-connected condition. *See Norris v. West*, 12 Vet.App. 413, 420-21 (1999) ("A TDIU rating is not a basis for an award of service connection. Rather, it is merely an alternate way to obtain a total disability rating without being rated 100% disabled under the Rating Schedule."). Accordingly, if the issue on appeal is the proper rating, VA must consider the possibility of TDIU where there is evidence of unemployability. *Rice*, 22 Vet.App. at 453.

In contrast, unlike a matter involving TDIU, the appellant was not awarded a *higher* disability rating for his spine condition because of a neurological complication; he was awarded a

---

[21] Even assuming that the November 2009 NOD could serve to place the January 2018 rating decision into appellate status, there is no indication that VA issued an SOC as to the ratings assigned for radiculopathy of the bilateral lower extremities. *See* 38 U.S.C. § 7105(a) (2017) ("Appellate review will be initiated by a[n NOD] and completed by a [S]ubstantive [A]ppeal after a[n SOC] is furnished."). Accordingly, even if the Board had jurisdiction over that matter, it appears that remand for VA to issue an SOC would have been appropriate.

27

*separate* disability rating for the complication on a secondary basis. *See* 38 C.F.R. § 4.71a, General Rating Formula for Diseases and Injuries of the Spine, Note 1; 67 Fed. Reg. at 56,510 (characterizing the gastrointestinal, genitourinary, and neurologic abnormalities as "disabilities" that "stem from diseases and injuries of the spine"). Moreover, the Court in *Harper* distinguished *Grantham*, which held that an NOD is required to place "elements of an application for benefits that were not previously adjudicated" into appellate status, 30 Vet.App. at 361, explaining that TDIU may be placed into appellate status by an NOD as to the rating for the service-connected condition because it is part of a claim for an increased evaluation. *Id.* at 361-62. The appellant's "part and parcel" argument, therefore, is unpersuasive. *See Ross v. Shinseki*, 21 Vet.App. 528, 532 (2008) (differentiating between TDIU and the incurrence of additional disabilities as a result of a service-connected disability), *aff'd sub nom. Ross v. Shinseki*, 309 F. App'x 394 (Fed. Cir. 2009).

## VI. Remedy

For these reasons, I would find that the Board committed legal error in concluding that it had jurisdiction over the issue of the proper disability rating for radiculopathy and dismiss the appeal of that part of the Board decision that denied entitlement to disability ratings in excess of 20% for bilateral lower extremity radiculopathy. As for the Board's grant of 20% disability ratings for radiculopathy, although the Secretary requests that the Court vacate that part of the Board decision as ultra vires, I would conclude that that matter is not properly before the Court. *See* 38 U.S.C. § 7252(a) ("The Secretary may not seek review of any [Board] decision."); *Bond v. Derwinski*, 2 Vet.App. 376, 377 (1992) (per curiam order) ("This Court's jurisdiction is confined to the review of final Board . . . decisions which are adverse to a claimant.").

However, I also am compelled to note that the Board issued the decision on appeal on April 20, 2018, only three-and-a-half months after the RO, on January 8, 2018, mailed to the appellant notice of its decision granting benefits for radiculopathy of the bilateral lower extremities and assigning 10% disability ratings for each leg. A legacy claimant has 1 year from the date on which a decision is mailed to file an NOD, 38 U.S.C. § 7105(b)(1)(A); the Board's determination that it had jurisdiction over the matter of the proper ratings for radiculopathy, despite the lack of an NOD as to those matters, may have led the appellant to believe that he did not *need* to file an

NOD as to the January 2018 rating decision.[22] Because the 1-year period to appeal the January 2018 rating decision has since passed, if the Court had dismissed his appeal of the Board's decision denying entitlement to higher initial disability ratings for radiculopathy, that would, in my view, raise a serious question as to what recourse should be available to the appellant. *See* 38 U.S.C. § 503(a), (b) (authorizing the Secretary to provide equitable relief); *Bailey v. West*, 160 F.3d 1360, 1365 (Fed. Cir. 1998) (en banc) (holding that equitable tolling may be justified if a veteran received erroneous information from a VA employee that induced him or her to miss the filing deadline); *Chastain v. West*, 13 Vet.App. 296, 299 (2000) (holding that there must be a cause-and-effect relationship between the misinformation provided and the veteran's late filing), *aff'd sub nom. Chastain v. Principi*, 6 F. App'x 854 (Fed. Cir. 2001) (per curiam).

---

[22] In that regard, it is also noteworthy—and perhaps disconcerting—that, while this matter was on appeal to the Court, the Secretary took *three different* positions as to the appropriate remedy regarding radiculopathy, initially contending that the Board had jurisdiction and remand was warranted. *See* Secretary's Br. at 18 (asking the Court to vacate and remand that part of the Board's decision that denied a rating higher than 20% for radiculopathy of each lower extremity because the Board provided inadequate reasons or bases for its determination that higher ratings were not warranted); Jan. 16, 2020, Notice of Clarification, at 2-3 (contending that the Board "technically did not have jurisdiction" over radiculopathy but noting that the Secretary "does not now seek to disturb" the favorable grant of 20% ratings); Secretary's Supp. Memo. at 18-20 (arguing that the Board's award of a 20% rating for each bilateral lower extremity was a nullity, not a favorable factual finding, and asking the Court to vacate that part of the Board's decision and dismiss the appeal of that matter).